PEDRO ORTIZ ÁLVAREZ en su carácter de SECRETARIO DE D.A.C.O., ETC., peticionarios, *v.* JUNTA DE CONDÓMINOS DEL CONDOMINIO MARTÍ ET AL., querellados; MIGUEL CINTRÓN y GERTRUDIS CINTRÓN , interventores y recurridos.

*Número:* CE-87-537 *Resuelto:* 30 de junio de 1988

808

*Manuel Izquierdo Encarnación* y *Lillian Ruiz De Jesús*, abogados del Departamento de Asuntos del Consumidor, peticionario; *Luz de Burgos Landing*, abogada de los interventores y recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El 12 de agosto de 1985, la Sra. María Mulero Sepúlveda, titular del apartamento 2-D del Condominio Martí en Miramar, presentó una querella ante el Departamento de Asuntos del Consumidor (D.A.C.O.). En la misma impugnó, como omisión, la inacción del entonces Presidente de la Junta de Condóminos, Ernesto Torres Alcalá, respecto a la queja que le sometieron en torno a la condómino Gertrudis Abreu —casada con Miguel Cintrón— por alegadamente "cerr[ar] una pared en el corredor común, cerrando el vestíbulo común de los apartamentos". Apéndice VI, pág. 10.

Luego de una investigación preliminar, D.A.C.O. citó para vista *únicamente* a la Junta de Condóminos y a la querellante Mulero Sepúlveda. La Junta de Condóminos no compareció. Celebrada la misma, y evaluada la prueba presentada solamente por la querellante Mulero Sepúlveda, D.A.C.O. declaró con lugar la querella. Ordenó a la Junta de Condóminos que dentro de un término de veinte (20) días adoptase las medidas necesarias para que los titulares del apartamento 2-E, los esposos Cintrón-Abreu, restituyesen a su condición original el pasillo y las ventanas del apartamento 2-D.

Oportunamente, la Junta de Directores —representada por su nueva Presidenta Sra. Dorielsa Cabrera— solicitó a D.A.C.O. la reconsideración aunque también le informó que, en acatamiento de su orden, había concedido a los esposos Cintrón-Abreu un plazo improrrogable de veinte (20) días para su cumplimiento. Estos últimos —como titulares del apartamento 2-E— solicitaron intervenir en el proceso administrativo y que se reconsiderase la orden dictada. D.A.C.O. se negó a reconsiderar en ese momento, pero permitió la intervención. Citó a todas las partes para una audiencia en reconsideración con el propósito de evaluar la prueba de los esposos interventores. A ésta compareció la

querellante Mulero Sepúlveda, además de los esposos Cintrón-Abreu representados por sus respectivos abogados, quienes presentaron su prueba documental y testifical.(1) Nuevamente, la Junta de Condóminos no compareció.

Con vista a esa prueba, D.A.C.O. concluyó que no había fundamentos para dejar sin efecto su resolución original.

Inconformes, los esposos Cintrón-Abreu solicitaron revisión ante el Tribunal Superior, Sala de San Juan. Dicho foro concedió término a las partes para que mostraran causa por la cual no debía expedir el auto y revocar el dictamen administrativo. Al hacerlo, intimó como criterio preliminar que "no parece ser apropiado utilizar el mecanismo dispuesto en la Ley de Propiedad Horizontal para la presentación de querellas de un condómine [sic] contra la Junta de Directores para resolver lo que realmente es una disputa particular entre dos condómines [sic] diferentes en la cual la Junta de Directores realmente no es parte". Apéndice XIII, pág. 25.

Con el beneficio de la comparecencia de D.A.C.O. y demás partes, el tribunal declaró sin lugar la solicitud de revisión. Concluyó que no se justificaba la intervención judicial con el remedio concedido por D.A.C.O., debido a que "durante la vista en reconsideración la parte ahora recurrente [los esposos Cintrón-Abreu] no presentó evidencia adecuada para sostener su teoría de que el área en disputa le pertenecía, a pesar de la oportunidad que se le concedió . . .". Apéndice XV, pág. 22. En su sentencia, plasmó su preocupación en cuanto al hecho de que D.A.C.O. no notificó a los condóminos afectados por su determinación desde el co-

---

(1) En aquella ocasión testificó el ex Presidente de la Junta de Directores, señor Torres Alcalá, además de las señoras Cintrón y Mulero. Esta última fue interrogada por la abogada de los esposos Abreu-Cintrón. El Sr. Arsenio Matos Pérez, vendedor del edificio originalmente, aunque presente, no declaró a base de que su testimonio constituía prueba acumulativa. La prueba documental consistió de la escritura de compraventa del apartamento 2-E y cuatro (4) fotografías del área en controversia.

mienzo del trámite y expuso que —con miras a evitar violaciones al debido proceso de ley— debía permitírseles participar en el trámite desde sus inicios y no solamente en la etapa de reconsideración.

Los esposos interventores solicitaron reconsideración. Previa vista, la sala de instancia modificó su sentencia ya que a su entender, "[a] la luz de los argumentos ofrecidos durante dicha vista el Tribunal quedó convencido que el procedimiento habido en [D.A.C.O.] resultó fundamentalmente injusto, por motivo [de] que a la parte ahora recurrente no se le dió participación desde su origen en los procedimientos ante [D.A.C.O.], a pesar de que era ella y no la Junta de Directores del Condominio la parte verdaderamente interesada en defenderse de las imputaciones hechas por la parte querellante. El permitirle a esa parte únicamente una intervención limitada en etapa de reconsideración realmente no subsanó las anteriores fallas". Alegato de la parte recurrida, pág. 3.

Ante una reconsideración de D.A.C.O., el foro de instancia se reafirmó. A solicitud de éste revisamos.

## II

La Ley de la Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958 (31 L.P.R.A. sec. 1291 *et seq.*), respondió al desplazamiento hacia la ciudad de amplios sectores poblacionales de nuestra sociedad. Esto ocasionó grandes aglomeraciones de personas y trajo como consecuencia directa una súbita escasez de vivienda incapaz de responder a la demanda del momento. Lo limitado del terreno, su alto costo y las pocas unidades de vivienda disponibles imposibilitaron que ese grueso poblacional movilizado hacia la urbe pudiese adquirir una propia. Del concepto horizontal se pasó al vertical. Como consecuencia, comenzaron a construirse y venderse pisos o apartamentos en calidad de residencias permanentes. En respuesta a esta nueva tendencia, e inspi-

rada mayormente en la vanguardista legislación cubana — *Arce v. Caribbean Home Const. Corp.*, 108 D.P.R. 225, 235 (1978)— se aprobó el estatuto con el fin de dotar a esta institución de "cauces jurídicos por los cuales desenvolverse *para que no sea un nido de conflictos que amarguen la realización del ideal del hogar propio*". (Énfasis suplido.) 10 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 3, pág. 1574 (1958).

Ante los cambios significativos habidos en las condiciones socioeconómicas que prevalecían al momento de su promulgación en 1958, con un enfoque pragmático y el beneficio de una amplia visión empírica, en el 1976 la Legislatura llevó a cabo una abarcadora reforma de sus preceptos regulatorios.[2] De ese modo se intentó superar varias deficiencias detectadas en la operación del estatuto anterior que tendían más bien a obstaculizar la cabal realización de los propios objetivos públicos perseguidos.

Expongamos los principios atinentes a la solución del recurso.

### III

▪ Primeramente, la nueva ley es una reafirmación del concepto de vida en comunidad. Establece mecanismos para la tramitación de los inevitables conflictos dimanantes del modus vivendi bajo un régimen de propiedad horizontal. Sus Arts. 8 y 14 (31 L.P.R.A. secs. 1291f y 1291*l*) regulan la utilización de los elementos comunes del inmueble. Disponen para una participación proporcional a la superficie de cada apartamento y requieren que ésta sea "conforme a su destino, sin impedir o estorbar el legítimo derecho de los demás". 31 L.P.R.A. sec. 1291*l*. Entre los elementos co-

---

[2] Ley Núm. 157 de 4 de junio de 1976 (31 L.P.R.A. sec. 1291), *in fine*; F. Hernández Denton, *La Ley de Propiedad Horizontal —un análisis de las enmiendas del 1976*, 44 Rev. C. Abo. P.R. 257 (1983).

munes generales del inmueble, el Art. 11 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291i(b) y (h), en lo pertinente, señala lo siguiente:

Se consideran elementos comunes generales del inmueble:

.    .    .    .    .    .    .    .

(b) Los cimientos, paredes maestras, techos, galerías, *vestíbulos*, escaleras y vías de entrada y salida o de comunicación.

.    .    .    .    .    .    .    .

(h) Todo lo demás que fuere racionalmente de uso común del inmueble o necesario para su existencia, conservación, seguridad y adecuado uso y disfrute. (Énfasis suplido.)

■ Segundo, establece el marco organizacional del gobierno interno. "Para viabilizar el gobierno conjunto de un edificio sometido a la propiedad horizontal, la ley crea como organismo rector y deliberativo el Consejo de Titulares." *Arce v. Caribbean Home Const. Corp.*, supra, pág. 252. Éste, como "órgano soberano en la organización y gobierno de la propiedad horizontal" —J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1973, T. III, Vol. 2, pág. 462— tiene el deber de aprobar un reglamento interno del condominio que "podrá contener todas aquellas normas y reglas en torno al uso del inmueble y sus apartamientos, ejercicios de derechos, instalaciones y servicios, gastos, administración y gobierno, seguros, conservación y reparaciones, que no contravengan las disposiciones de este Capítulo". Art. 37 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1293a. Por mandato expreso del estatuto, éste contendrá normas que rijan el "[c]uidado, atención y vigilancia del inmueble en sus elementos y servicios comunes, generales o limitados". 31 L.P.R.A. sec. 1293a(c).

■ La Junta de Directores —electa por el voto mayoritario de los miembros del Consejo de Titulares— tiene, entre otras facultades, el deber de "[a]tender todo lo relacionado

con el buen gobierno, administración, vigilancia y funcionamiento del régimen *y en especial lo relativo a las cosas y elementos de uso común y los servicios generales, y hacer a estos efectos las oportunas advertencias y apercibimientos a los titulares*". (Énfasis suplido.) Art. 38-D(a) de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1293b-4(a). Además, debe "[c]umplir y hacer cumplir las disposiciones de este Capítulo, del reglamento y los acuerdos del Consejo de Titulares". 31 L.P.R.A. sec. 1293b-4(i).

■ Tercero, canaliza la solución de los problemas resultantes de esa vida comunitaria. Una de las enmiendas más significativas fue la de encomendar a un foro administrativo la rápida adjudicación de los reclamos que pudieran presentar los condóminos, relativos a la administración del edificio: D.A.C.O.

■ La ley confirió jurisdicción exclusiva a dicha agencia para entender en acciones de impugnación de los acuerdos del Consejo de Titulares, de las determinaciones, actuaciones u *omisiones* del Director o de la Junta de Directores, relacionadas con la administración de inmuebles que comprendan por lo menos un apartamento destinado a vivienda. Arts. 42 y 48 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. secs. 1293f y 1294. Véase *First Fed. Savs. v. Asoc. de Condómines*, 114 D.P.R. 426, 434 (1983).

Frente a este esquema legislativo evaluamos el recurso.

## IV

■ Alegan los interventores Cintrón-Abreu que D.A.C.O. carecía de jurisdicción para dirimir la controversia debido a que ésta "no se trata sobre una acción u omisión de la Junta sino de actos voluntarios de titulares o condómines [*sic*] que sólo deben ser revisados y resueltos por los tribunales de justicia". Alegato de la parte recurrida, pág. 9.

De entrada, y contrario a dicha alegación, la querella presentada ciertamente cae dentro del ámbito operacional de la Junta de Directores del Condominio Martí. No se trata meramente de actos voluntarios de titulares o condóminos. De su faz afloraba una genuina controversia que trascendía los intereses personales y privados. Versaba sobre la utilización, por parte del matrimonio interventor, de un vestíbulo de carácter y aprovechamiento *común* según descrito en la Escritura de Conversión del inmueble al régimen de propiedad horizontal, otorgada el 21 de mayo de 1970.(3) Aun así, aseguran éstos que dicha área no es común, sino que realmente constituye la terraza de su apartamento y que las paredes cerradas eran medianeras con respecto a su apartamento 2-E y el 2-D perteneciente a la señora Mulero Sepúlveda. No tienen razón. Ninguna de las paredes en controversia separa inmediatamente esos apartamentos ni existe una servidumbre de medianería. La Escritura de Conversión refleja que la única pared medianera que los divide es una *interior*, fuera del área en cuestión. La misma colinda con el apartamento 2-D por el *este* en nueve (9) pies, y por el *oeste*, en distancia igual, con el 2-E. Dicha pared nada tiene que ver con el área común en controversia.

Más aún, aceptando como cierto —para fines de análisis— que el área fuera privativa, ello no beneficiaría a los

---

(3) Allí se señala que en el segundo piso hay un *vestíbulo y corredor para uso común de los apartamentos 2-D y 2-E*. Además, al describir los apartamentos, se indica que el 2-D "[c]olinda por el NORTE, en Tres Pies (3') con *vestíbulo de aprovechamiento común* . . . por el ESTE, en Nueve Pies (9') con pared interior del edificio que lo separa del Aparta[mento] Dos 'E' (2E), y en Ocho Pies Seis Pulgadas (8'6") con *vestíbulo de aprovechamiento común* . . .". Apéndice XIV, pág. 2.

El apartamento 2-E "[c]olinda por el NORTE . . . en seis pies seis pulgadas (6'6") con *vestíbulo y corredor de aprovechamiento común* . . . por el OESTE . . . en Ocho Pies seis pulgadas (8'6") con *vestíbulo de aprovechamiento común del edificio* . . .". (Énfasis suplido.) Escritura de Conversión de Inmueble de 21 de mayo de 1970, pág. 252.

interventores Abreu-Cintrón. A lo sumo, realmente lo que había eran signos exteriores *contrarios a una medianería.* A tal efecto, el Art. 509 del Código Civil, 31 L.P.R.A. sec. 1753(1), preceptúa que "[s]e entiende que hay signo exterior, contrario a la servidumbre de medianería . . . [c]uando en las paredes divisorias de los edificios haya *ventanas* o huecos abiertos". (Énfasis suplido.)

La evidencia ante nos establece que las ventanas clausuradas existían en la pared desde que se construyó originalmente el edificio. Con este historial en mente, no podemos razonablemente inferir que el área que separa ambos apartamentos sea en realidad una terraza privada de los interventores y que, por error o inadvertencia, al construirse el edificio se abrieron ventanas en paredes medianeras. Repetimos, la Escritura de Conversión es contraria a esa contención.

■ Ante la inacción de dicha Junta, actuó correctamente Mulero Sepúlveda al acudir legítimamente al foro establecido por ley para dilucidarla. Concluir lo contrario sería cercenar las facultades otorgadas por el legislador tanto a la Junta de Directores como a D.A.C.O. y, al mismo tiempo, derrotar la sabia política pública que la inspira.

V

Sostienen los interventores recurridos que D.A.C.O. no tenía jurisdicción para evaluar la controversia planteada debido a que había transcurrido el término establecido por ley para acudir a la agencia. Tampoco tienen razón.

■ El Art. 42 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1293f, gobierna la cuestión. Bajo el mismo, un acuerdo, determinación, *omisión* o actuación de los funcionarios u organismos rectores del condominio puede ser impugnada por: (1) ser gravemente perjudicial al titular querellante; (2) ser gravemente perjudicial a la comunidad de titu-

lares; (3) ser contraria a la ley; (4) ser contraria a la escritura de constitución, y (5) ser contraria al reglamento del condominio.

◼ Los términos para presentar ante D.A.C.O. estas acciones se establecen en el segundo párrafo del mencionado artículo:

> La acción de impugnación de acuerdos y determinaciones, que el titular estimase gravemente perjudiciales para él o para la comunidad de titulares deberá ejercitarse dentro de los treinta (30) días siguientes a la fecha en que se tomó dicho acuerdo o determinación, si se hizo en su presencia, o dentro de los treinta (30) días siguientes a la fecha en que recibe la notificación del acuerdo, si el titular afectado no estuvo presente en el momento en que se llegó a tal acuerdo o determinación. Si se tratare de una actuación u omisión perjudicial, el plazo para ejercitar la acción de impugnación será dentro de los treinta (30) días siguientes a la fecha en que el titular tenga conocimiento de tal actuación u omisión perjudicial. 31 L.P.R.A. sec. 1293f.

◼ La interpretación de D.A.C.O.([4]) respecto al límite de treinta (30) días es que éste aplica "exclusivamente para la acción de impugnación de *acuerdos y determinaciones* que el titular estimase gravemente perjudiciales para él o para la comunidad de titulares. *Las demás acciones, las fundadas en que los actos de los órganos de gobierno del condominio son contrarios a la ley, a la escritura de su constitución o a su reglamento, no están sujetas para su ejercicio a ese breve plazo*". (Énfasis suplido.)

◼ Refrendamos la misma. Es postulado básico en derecho administrativo que la interpretación de un estatuto, por el organismo facultado por ley para velar por su adminis-

---

([4]) Entre otros, véanse *Rafael L. Rivera v. Lillian Castañeda*, QPH 86-76, y *Skytowers III v. Consejo de Titulares Condominio Cobian's Plaza*, QPH 86-111.

tración y cumplimiento, merece gran respeto y deferencia judicial. *A.R.P.E. v. Ozores Pérez*, 116 D.P.R. 816 (1986); *M & V Orthodontics v. Negdo. Seg. Empleo*, 115 D.P.R. 183, 188–189 (1984); *Tormos & D. A. C. O. v. F. R. Technology*, 116 D.P.R. 153, 160 (1985); *Rubin Ramírez v. Trías Monge*, 111 D.P.R. 481, 484–485 (1981). Bajo este enfoque, la inacción de la Junta de Directores del Condominio Martí ante la querella presentada por Mulero Sepúlveda configura una *omisión* violatoria de la ley y del reglamento interno del condominio. Las actuaciones de los esposos Abreu-Cintrón afectan un área común y son contrarias a la ley y al Reglamento del Condominio Martí. Éste, en su Art. 14, establece que "[n]ingún titular podrá hacer cambios o mejoras en su propiedad que afecten o cambien la estructura del condominio. Todas las mejoras que se hagan al condominio, así como cualquier restauración[,] deberá[n] hacerse con el consentimiento unánime de todos los condómin[o]s". No hay nada en los autos originales del caso que nos indique que existía el consentimiento requerido.

Ante este cuadro fáctico, y con el beneficio de la interpretación de D.A.C.O., debemos concluir que la querella presentada por Mulero Sepúlveda no estaba prescrita.

## VI

Sostienen los recurridos —esposos Cintrón-Abreu— que por ser ellos la parte verdaderamente interesada debió permitírseles participar en el proceso administrativo desde su etapa inicial y que el no hacerlo constituyó una violación al debido proceso de ley. Aunque originalmente la ilustrada sala de instancia rechazó esa contención, en reconsideración varió su dictamen. Al hacerlo erró. Examinemos los preceptos constitucionales del debido proceso de ley y su significado jurisprudencial pertinente.

Nuestra Constitución reconoce como derechos fundamentales del ser humano el derecho a la vida, a la libertad

y al disfrute de la propiedad. En protección de éstos, establece que "[n]inguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes". Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 275.(5)

Ciertamente estos preceptos constitucionales aplican al ámbito del derecho administrativo cuando el Estado, a través de alguna de sus agencias, interviene con alguno de dichos derechos. *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265 (1987). Sin embargo, en esta dimensión su aplicación varía. La creación de las agencias administrativas y la delegación a éstas de poderes cuasijudiciales se llevó a cabo con el propósito de proveer un sistema adjudicativo económico, rápido y práctico. Para la consecución de ese propósito, fue necesario dotarlo de una flexibilidad mayor que la del trámite judicial ordinario. *Pérez Ríos v. Hull Dobbs*, 107 D.P.R. 834, 840 (1978). Dicho proceso debe ser "ágil y sencillo, que propicie su uso eficiente por parte de personas legas". (Énfasis suprimido.) *López Vives v. Policía de P. R.*, 118 D.P.R. 219, 231 (1987).

Aunque, según decidimos en *López Vives v. Policía de P. R.*, supra, "una parte afectada tiene derecho a presentar toda la prueba necesaria para sostener su reclamo, así como refutar oralmente o por escrito la evidencia sometida en su contra", en *Rodríguez v. Tribunal Superior*, 104 D.P.R. 335, 340 (1975), señalamos que "[e]l debido proceso de ley ofrece protección contra la arbitrariedad administrativa *pero no es molde rígido que prive de flexibilidad en toda instancia los procedimientos de administración*".

---

(5) En Estados Unidos, véanse las Emdas. V y XIV, Const. E.U., L.P.R.A., Tomo 1.

(Énfasis suplido.) Véase F.B. Davis, *Administrative Law: Today & Tomorrow*, 22 J. Pub. L. 335, 352 (1973). Lo esencial es que cumpla con el requisito de un proceso "justo y equitativo que respete la dignidad de los individuos afectados". *López Vives v. Policía de P. R.*, supra.

En nuestro caso, la parte interventora tuvo amplia oportunidad de presentar ante D.A.C.O. —en la vista en reconsideración celebrada el 7 de mayo de 1986— *toda* la prueba documental y testifical que tenía disponible para apoyar su posición. Así lo hizo. Además, interrogó a la señora Mulero Sepúlveda respecto a varios aspectos relacionados con el área en controversia. Véase Transcripción de Vista Administrativa, págs. 44–47.

Aunque de ordinario D.A.C.O. debe citar a todas las partes afectadas, bajo las circunstancias particulares que rodean la controversia planteada ante nos entendemos que la vista *en reconsideración* subsanó los posibles defectos de la vista inicial y el debido proceso de ley. El criterio original del tribunal de instancia estuvo correcto y debe prevalecer.

### VII

Finalmente, no es de aplicación al caso de autos la doctrina de incuria. Hemos señalado anteriormente que ésta "no opera como un simple término prescriptivo en que el mero transcurso del tiempo es suficiente para impedir el ejercicio de la causa de acción. Su aplicación requiere, además del transcurso del tiempo, que se haya ocasionado un perjuicio al demandado o que se le haya puesto en desventaja por razón del tiempo transcurrido". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 417 (1982). Véanse, también: *Pueblo v. Tribl. Superior*, 81 D.P.R. 904, 915 (1960); *Alonso v. Tribl. Examinador de Médicos*, 74 D.P.R. 158, 165 (1952); *Jiménez v. Junta de Retiro*, 61 D.P.R. 171, 180 (1942).

*Se dictará la correspondiente sentencia revocatoria.*