CONDOMINIO PROFESIONAL SAN JUAN HEALTH CENTRE, demandante y recurrida, v. P.R.F., INC., demandada y recurrente.

*Número:* RE-91-497          *Resuelto:* 27 de mayo de 1993

*Yolanda Da Silveira Neves* y *R. Alex Fleming*, de *Lespier & Muñoz Noya, José R. Martínez Ramos*, de *Martínez, Camacho & Laffite*, y *Michael J. Godreau*, abogados del recurrente; *Awilda Enid López Palau*, abogada del recurrido.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

El concepto del Régimen de Propiedad Horizontal es relativamente joven en Puerto Rico. Su origen en 1958 (Ley Núm. 104 de 25 de junio de 1958 (31 L.P.R.A.

sec. 1291 *et seq.*)), y posteriormente las enmiendas introducidas en 1976 (Ley Núm. 157 de 4 de junio de 1976 (31 L.P.R.A. sec. 1291 *et seq.*)), tuvieron como propósito permitir la propiedad individualizada de un apartamiento para vivienda o unidad comercial, aunque éste sea parte —junto a otros apartamientos o unidades— de un mismo edificio o inmueble. No cabe duda que el Régimen de Propiedad Horizontal está sujeto a evolución y desarrollo para atender las necesidades sociales y económicas cambiantes de un país isleño con escasez de viviendas y terrenos, gran concentración poblacional, escasos recursos naturales y económicos, exparcimiento urbano y un costo creciente de la infraestructura. Esto requiere imaginación y creatividad para su uso e interpretación, y así lograr el mejor aprovechamiento de nuestros recursos de forma que la población logre una calidad de vida de excelencia, tanto urbana como rural, sana convivencia, interacción social y el respeto que se debe tener a la vida privada y a los derechos de todos los ciudadanos.[1] Aunque inicialmente el Régimen de Propiedad Horizontal se concibió en Puerto Rico como una herramienta para la solución del problema de la escasez de terrenos para la vivienda, éste se ha utilizado para el uso combinado de apartamientos con fines de vivienda y comerciales en un inmueble. Incluso, recientemente se ha utilizado en inmuebles destinados únicamente para fines comerciales y profesionales, como el caso que nos ocupa. El concepto Régimen de Propiedad Horizontal y el derecho que lo regula ha permitido —y debe permitir— esta evolución; esto es, ser un régimen capaz de responder a las necesidades y aspiraciones cambiantes de las generaciones futuras dentro de los parámetros conceptuales y jurídicos que lo regulan.[2]

---

[1] Sobre el marco conceptual del Régimen de Propiedad Horizontal véase, además, *Consejo Tit. Cond. McKinley Court v. Rullán*, 126 D.P.R. 387 (1990), voto particular y de conformidad.

[2] No es este el caso ni el momento para pasar juicio sobre si la Ley de la Propiedad Horizontal podría aplicar o no a urbanizaciones o a otros espacios que no

Al interpretar nuestro enfoque, se debe tomar en cuenta esta realidad jurídica, social y económica.

## I

El recurso presente requiere que evaluemos la validez legal del derecho a variar el uso y la finalidad de ciertos apartamientos que se reservó la desarrolladora y propietaria original y única de un inmueble, al someter éste al Régimen de Propiedad Horizontal. Tales reservas fueron incorporadas en la escritura matriz de conversión del inmueble al Régimen de Propiedad Horizontal. Además, nuestra expresión requiere evaluar acerca del grado de especificidad con que debe consignarse el uso de los apartamientos en la escritura matriz y su efecto.

En la acción incoada por el Consejo de Titulares, el tribunal de instancia decretó la nulidad de la reserva señalada y falló a favor de los demandantes, quienes impugnaron la intención de la demandada de vender un apartamiento, que se destinaría a un uso distinto para el cual se había consignado específicamente en los documentos constitutivos del Régimen de Propiedad Horizontal. De dicho dictamen acude ante nos la compañía desarrolladora y titular única original del inmueble. Confirmamos la sentencia del tribunal de instancia.

La adjudicación de las cuestiones planteadas exige un examen cuidadoso de los hechos en cuestión. Veamos.

## II

La recurrente P.R.F., Inc. fue la única propietaria de la totalidad de los apartamientos y demás elementos que

son edificios multipisos. Véanse: M. Godreu, *El condominio y el régimen de propiedad horizontal*, San Juan, Ed. Dictum, 1992, págs. 1–14; F. Hernández Denton, *La Ley de Propiedad Horizontal: un análisis de las enmiendas de 1976*, 44 Rev. C. Abo. P.R. 257, 266 (1983); E. Vázquez Bote, *Prolegómenos al régimen de la horizontabilidad en el Derecho puertorriqueño*, Año XVI (Núm. 64) Rev. Der. Pur. 313 (1977).

componen el inmueble conocido como Condominio Profesional San Juan Health Centre (en adelante Condominio Profesional S.J.H.C.). Mediante la Escritura Pública Núm. 4 de 5 de diciembre de 1986 otorgada ante el notario José Juan Torres Escalera, la recurrente constituyó este inmueble al Régimen de Propiedad Horizontal.

Su intención, mediante la constitución del régimen, no fue únicamente la de individualizar los apartamientos para hacerlos susceptibles de aprovechamiento independiente sino, además, fue *la de desarrollar un concepto particular de facilidades médico-hospitalarias* en la cual se ofrecieran "al público en un mismo lugar oficinas que cubran las diferentes especialidades de la medicina evitándole así a las personas las molestias que acarrea el ir de una oficina médica a otra, muchas veces exponiendo a la persona a mayores riesgos". Solicitud de revisión, pág. 14.

A tales efectos, se dividió el edificio en dos (2) partes principales. Una compuesta por los primeros cuatro (4) pisos, en los cuales se ubican básicamente las instalaciones médicas *propiedad de P.R.F., Inc.* Éstas constan de un centro para terapia física y rehabilitación (apartamiento B-2), un centro de sistemas de información computarizados (B-3), sala de emergencias, tratamiento para el asma y radiología (103), oficina de información y seguridad (113), centro de alumbramiento (203), centro de endourología (204), centro de revelado de placas de radiografía (223), centro de cirugía ambulatorio y salas de operaciones (301), salón de reuniones para la facultad médica (401), laboratorio clínico (402), laboratorio de radiografía (403) y centro de radiología especializada (404). En síntesis, la participación del inmueble retenido por la recurrente consiste de toda una infraestructura de laboratorios, equipo y facilidades médicas para el uso de la facultad médica del condominio, además del estacionamiento, de las áreas donde ubican el manejo de los servicios de agua, de energía eléctrica y de los aires

acondicionados, y de áreas para el manejo de desperdicios y almacenamiento de materiales.

La otra parte del inmueble —comprendida mayormente de los pisos quinto al séptimo— consiste en oficinas privadas desde donde ejercen su práctica los diversos miembros de la facultad médica adquirentes de éstas y dedicados a diferentes especialidades dentro de la medicina.

En la escritura matriz, se estableció el uso específico al que habrían de destinarse, los apartamientos descritos, en los primeros niveles del inmueble, así como de otros apartamientos destinados a servir como restaurante (102), agencia de viajes (111), una óptica (105), banco electrónico (112) y para una oficina dedicada a la práctica de la arquitectura y la ingeniería (708). Además, y en términos más generales, se estableció el uso de los apartamientos 101, 106, 107 y 108 como destinados a uso comercial.

Con respecto a los apartamientos destinados a oficinas médicas, no se estableció un uso más restrictivo en el texto de la escritura matriz constitutiva del Régimen de Propiedad Horizontal. No obstante, en la decimoctava cláusula de esta escritura se establece:

### USO DE LOS APARTAMENTOS DESTINADOS A OFICINAS MÉDICAS

DECIMOCTAVO: Los siguientes apartamientos serán destinados a *oficinas médicas y se utilizarán exclusivamente* para tales fines *según se dispone específicamente en el Reglamento para La Operación del Condominio Profesional San Juan Health Centre*: Apartamientos número quinientos uno (501) a quinientos diez (510) inclusive; apartamientos número seiscientos uno (601) a seiscientos diez (610), inclusive; apartamientos número setecientos uno (701) a setecientos siete (707) inclusive y apartamientos número setecientos nueve (709) y setecientos diez (710)[.] (Énfasis suplido.) Escritura matriz, pág. 180.

*Mediante la cláusula vigésimosegunda de la escritura, el referido reglamento pasó a formar parte de ésta insertándose como su anexo A. Cf.* Art. 36 de la Ley de la Propiedad

Horizontal, 31 L.P.R.A. sec. 1293. Respecto a los usos de las referidas oficinas médicas, el Reglamento para la Operación y Administración del Condominio Profesional S.J.H.C. establece:

ARTÍCULO 33 *Normas y Reglas Específicas regulando el uso de los apartamientos destinados oficinas médicas.*

a[.] *Todos los apartamientos destinados a oficinas médicas se utilizarán exclusivamente para la práctica de la medicina y por médicos debidamente aceptados como miembros de la facultad médica de San Juan Health Centre.*

b[.] *Específicamente los siguientes apartamientos que serán destinados a oficinas médicas serán utilizados exclusivamente para la práctica de las siguientes áreas y/o especializaciones de la medicina, a saber.*
*Nivel Quinto*
Apartamiento número 501: Cardiología
Apartamiento número 502: Oftalmología
Apartamiento número 503: Oftalmología
Apartamiento número 504: Neumólogo Pediatra
Apartamiento número 505: Neumolog[ía] Pediatra
Apartamiento número 506: Cardiología
Apartamiento número 507: Pediatría
Apartamiento número 508: Obstetricia y Ginecología
Apartamiento número 509: Neumólogo de Adultos
Apartamiento número 510: Reumatología
*Nivel Sexto*
Apartamiento número 601: Cirugía Plástica
Apartamiento número 602: Cirugía Plástica
Apartamiento número 603: Ortopedia
Apartamiento número 604: Endocrinología
Apartamiento número 605: Oncología y Hematología
Apartamiento número 606: Cirugía Plástica
Apartamiento número 607: Medicina de Familia
Apartamiento número 608: Psiquiatría
Apartamiento número 609: Gastroenterología
Apartamiento número 610: Nefrología
*Nivel Séptimo*
Apartamiento número 701: Cirugía General Pediátrica
Apartamiento número 702: Anestesia
Apartamiento número 703: Neurología
Apartamiento número 704: Urología
Apartamiento número 705: Ortopedia
Apartamiento número 706: Cirugía General y Pediátrica
Apartamiento número 707: Oftalmología

Apartamiento número 709: Dentistas

Apartamiento número 710: Otorinolaringología

c[:] *La condición impuesta en este inciso pretende conservar la exclusividad dentro del Condominio Profesional San Juan Health Centre a los distintos médicos que utili[c]en dichos apartamientos para la práctica de su profesión en las distintas áreas o especializaciones de la medicina, según se indica y especifica.*

d[.] *Solo* [sic] se permitirá que un apartamiento sea utilizado para la práctica de la medicina un área o especialización *distinta* a las indicada[s] *específicamente* en el inciso (b) anterior *con consentimiento expreso y escrito de la Corporación PRF, Inc.* Se dispone además, que en caso de apartamientos que se propongan ser utilizados para la práctica de la medicina en un área o especialización distinta a la especificada para ese apartamiento en el inciso (b) anterior pero que a su vez sea una de las áreas o especializaciones a que ya se ha destinado otro los apartamientos, *se requerirá además para su utilización el consentimiento expreso y escrito del titular de ese otro apartamiento.* (Énfasis suplido y en el original.) Demanda, págs. 2–3.

Los hechos particulares que suscitaron el pleito que nos ocupa surgieron cuando P.R.F., Inc. decidió vender el apartamiento 701 a un médico que se proponía utilizarlo *para establecer su práctica profesional en la especialidad de medicina interna, cuando el uso establecido lo reservaba para la práctica de la cirugía general y pediátrica, y siendo ésta un área comprendida dentro del ámbito de otras de las especialidades ya existentes.* Ante los cuestionamientos de los demás titulares, la demandada *se apoyó en el Art. 33(d) del Reglamento y la cláusula decimotercera inciso (b) de la escritura matriz.* Mediante dicha cláusula, la demandada se reservó, entre otros, el derecho unilateral a "variar el uso y destino de los apartamientos y áreas del edificio que retenga y/o adquiera en el futuro". Sentencia, págs. 3–4.

Por tales motivos, el Dr. Osvaldo Jiménez, Presidente de la Junta de Directores del Consejo de Titulares del Condominio Profesional S.J.H.C., incoó una demanda a nombre de éste contra P.R.F., Inc., en la cual solicitó una orden de entredicho provisional y permanente para evitar que la demandada vendiese el referido apartamiento. Solicitó,

además, al tribunal de instancia que decretara la nulidad de la cláusula 13 de la Escritura Matriz y del Art. 33(d) del Reglamento en cuanto autorizan a la demandada a cambiar *unilateralmente* el uso y destino de los apartamientos de su propiedad, por ser contrarias a las disposiciones de la Ley de la Propiedad Horizontal que requieren el consentimiento unánime de los titulares para esos fines.

Luego de varios trámites procesales, el tribunal de instancia (Hon. Arnaldo López Rodríguez, Juez) dictó la sentencia sumaria a favor de los demandantes en la cual declaró nulas las disposiciones referidas. Inconforme con tal dictamen, la demandada instó el recurso de revisión ante nos.

En síntesis, alega que erró el tribunal de instancia al concluir que la Junta de Directores tenía capacidad jurídica para llevar la demanda en cuestión y al resolver la nulidad de la cláusula 13(b) de la Escritura Matriz y el inciso (d) del Art. 33 del Reglamento por hallarlos contrarios a las disposiciones de los Arts. 2 y 15-A de la Ley de la Propiedad Horizontal, 31 L.P.R.A. secs. 1291 y 1291m-1.

### III

De entrada, debemos destacar que la acción incoada por el doctor Jiménez no fue a nombre de la Junta de Directores, sino a nombre y en representación del Consejo de Titulares. Así surge de la demanda, de la sentencia del tribunal de instancia y de los demás documentos que obran en autos. Sin justificación aparente, la recurrente insiste en que la Junta de Directores es la parte que acciona en este pleito. Al parecer, entiende la recurrente, que como el Consejo de Titulares está compuesto por todos los dueños de apartamientos y locales de un condominio, del cual ella es parte, el presidente no podía incoar una acción a nombre del Consejo sin estar ella conforme con ésta. Por esta razón, parte de la premisa de que la acción se llevó a nombre

de la Junta de Directores o del Presidente del Consejo en su carácter personal, y no a nombre del "Consejo de Titulares como ente representativo de la *totalidad* de los titulares en el condominio". (Énfasis suplido.) Alegato de la parte recurrente, pág. 35.

Ciertamente el Consejo de Titulares lo componen la totalidad de los dueños de apartamientos y locales que componen un inmueble sometido al Régimen de Propiedad Horizontal. *Arce v. Caribbean Home Const. Corp.*, 108 D.P.R. 225, 252 (1978); *Srio. D.A.C.O. v. J. Condóminos C. Martí*, 121 D.P.R. 807 (1988). No obstante, según hemos resuelto, el Consejo de Titulares ostenta una personalidad jurídica distinta e independiente de los miembros que lo componen. Al respecto hemos señalado que éste constituye "un auténtico sujeto de derecho con personalidad plena en el ámbito de sus finalidades" sustentada por "una finalidad distinta de la individual y, esencialmente, una clara titularidad patrimonial que contribuye a otorgar al ente existencia jurídica independiente a la de los miembros que la componen cuando actúa en función del fin común perseguido". (Énfasis suprimido.) *Arce v. Caribbean Home Const. Corp.*, supra, pág. 253.

Como podemos apreciar, esta personalidad jurídica que, conforme a sus fines, se le reconoce en nuestro ordenamiento jurídico al Consejo de Titulares, se fundamenta no sólo en la potencialidad de un patrimonio propio distinto al de los propietarios individuales de los apartamientos que componen el inmueble, sino además, en el reconocimiento de que tiene intereses, deberes y finalidades distintas a la de los titulares individuales, las cuales pueden ser contrarias y contradictorias a las de determinados titulares en su carácter personal.[3] Véanse: *Consejo de Ti-*

---

[3] El titular que no esté conforme con una determinación o acuerdo del Consejo de Titulares tiene derecho a impugnarlo conforme el procedimiento estatuido en el Art. 42 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1293f.

*tulares v. Vargas,* 101 D.P.R. 579, 587 (1973); *Asoc. de Condómines v. Naveira,* 106 D.P.R. 88 (1977); *Asoc. Condóminos v. Seguros Arana,* 106 D.P.R. 133 (1977); *Maldonado Morales v. Consejo de Titulares,* 111 D.P.R. 427 (1981); *First Fed. Savs. v. Asoc. de Condómines,* 114 D.P.R. 426 (1983); *Consejo Tit. Cond. McKinley Court v. Rullán,* 126 D.P.R. 387 (1980), opinión particular y de conformidad; *Consejo Tit. C. Parkside v. MGIC Fin. Corp.,* 128 D.P.R. 538 (1991); *Asociación de Condóminos v. Trelles Reyes,* 120 D.P.R. 574 (1988).

La personalidad jurídica no es otra cosa, pues, que el cúmulo de prerrogativas y deberes que determinado ordenamiento jurídico le otorga o le reconoce a una entidad, porque dicho ordenamiento entiende que para la consecución de los fines del propio ordenamiento y para el logro de los fines de la entidad particular, conviene separar e independizar en diversos aspectos, de un lado, la entidad formada por el conjunto de personas y, de otro lado, los individuos que la integran. Los diversos aspectos que importa deslindar entre el colectivo y los individuos o personas que lo integran incluyen, entre otros, los procesos de toma de decisiones, la capacidad y forma de quedar vinculados y, sobre todo, la responsabilidad patrimonial.

Por ello, e independientemente de la controversia en torno a qué rama del Estado está facultada para impartirla, consideramos que sólo se justifica la concesión de la personalidad jurídica a una colectividad cuando:

1) Tenga una función o finalidad distinta a la de los particulares que la integran;

2) Los procesos decisionales de la colectividad se efectúen a base de criterios distintos al de esos individuos; y

3) Pueda identificarse un patrimonio, o la posibilidad de éste, propio de la colectividad, desvinculado del de los particulares.

No cabe duda de que los poderes que la Ley le concede al Consejo de Titulares son muy similares a los que ostenta cualquier corporación. De hecho, su estructura es prácticamente idéntica a la corporativa, inclusive la constitución de una Junta de Directores que se encarga de poner en vigor los acuerdos que tome el Consejo. Por otro lado, la finalidad y función del Consejo es claramente independiente y distinta de la de los indivi-

duos que lo integran, si bien totalmente armónica con los intereses de éstos.

El procedimiento a base del cual se toman los acuerdos del Consejo responde claramente a criterios también distintos e independientes de los criterios que utilizan los titulares como individuos para la toma de sus decisiones. M.J. Godreau, *El Condominio: el régimen de propiedad horizontal en Puerto Rico*, San Juan, Ed. Dictum, 1992, págs. 31–37.

■ Dicha personalidad jurídica capacita al Consejo de Titulares —como cuerpo— a ejercer sus derechos, a tomar ciertas determinaciones y a incurrir en obligaciones, incluso por encima de la voluntad individual de una minoría de sus miembros, siempre y cuando actúe conforme a la ley y dentro del ámbito de sus finalidades. "[S]iempre que en est[a ley] se haga referencia al Consejo de Titulares se entenderá la totalidad de ellos, *pero integrarán quórum para la adopción de acuerdos, la mayoría*, según ésta, queda definida en el Reglamento, salvo que en esta ley se disponga lo contrario." (Énfasis suplido.) 31 L.P.R.A. sec. 1291s.

Se trata aquí de la impugnación de una cláusula de la Escritura Matriz mediante la cual la recurrente se reservó, a su favor, el derecho unilateral de alterar el uso y destino de los apartamientos de su propiedad en alegada contravención de las disposiciones de la Ley de Propiedad Horizontal. El ejercicio de tales prerrogativas podría evidentemente desvirtuar y poner en peligro la existencia del régimen en dicho inmueble tratándose, en particular, de un concepto peculiar de centro de servicios médicos en el cual la alteración de los usos particulares a los cuales se dediquen varios apartamientos podría desvirtuar el propio concepto de la facilidad que se pretendió constituir mediante la adopción del régimen. Definitivamente la personalidad jurídica del Consejo de Titulares faculta a esta entidad para acudir a los tribunales bajo tales circunstancias. Véase F. Hernández Denton, *La Ley de*

*Propiedad Horizontal: un análisis de las enmiendas de 1976*, 44 Rev. C. Abo. P.R. 257, 275 (1983).

Establecida la capacidad jurídica del Consejo de Titulares para entablar el pleito en cuestión, tampoco abrigamos dudas sobre la capacidad del Presidente o de la Junta de Directores para representar a dicha parte en el pleito que nos ocupa. El Art. 38 de la ley establece que "[e]l Presidente representará en juicio y fuera de él a la comunidad en los asuntos que la afecten". 31 L.P.R.A. sec. 1239a-1. Por su parte, el Art. 38D de la Ley de la Propiedad Horizontal establece que:

> El Director o la Junta de Directores constituye el órgano ejecutivo de la comunidad de titulares y tendrá los siguientes deberes y facultades:
>
> (a) Atender todo lo relacionado con el buen gobierno, administración, vigilancia y funcionamiento del régimen y en especial lo relativo a las cosas y elementos de uso común y los servicios generales, y hacer a estos efectos las oportunas advertencias y apercibimientos a los titulares.
>
> .     .     .     .     .     .     .     .     .
>
> (i) *Cumplir y hacer cumplir las disposiciones de esta ley, del reglamento y los acuerdos del Consejo de Titulares.* (Énfasis suplido.) 31 L.P.R.A. sec. 1293b-4.

Dichas atribuciones implican necesariamente la facultad para acudir a los tribunales en representación de la comunidad de titulares con el fin de exigir el cumplimiento de las disposiciones de la Ley de la Propiedad Horizontal respecto a los asuntos que afecten a aquélla y en relación a los cuales el Consejo de Titulares decida actuar conforme la capacidad jurídica que se le reconoce para ello. Ello es así, inclusive en casos como éste en el cual se cuestiona la validez de una cláusula de la Escritura Matriz, alegando que se viola precisamente la Ley de la Propiedad Horizontal. Dicha ley es la fuente legal primaria de todo el Régimen de Propiedad Horizontal y es ella quien crea el organismo de la Junta de Directores. Véase *Srio. D.A.C.O. v. J. Condóminos C. Martí*, supra, págs. 815–816. Aclarada

la capacidad jurídica de la parte promovente, pasamos a examinar el segundo señalamiento de error.

## IV

Alega la recurrente que tanto la Escritura Matriz como el Reglamento, luego de inscribirse en el Registro de la Propiedad, fueron suscritos sin objeción alguna y con pleno conocimiento de todos sus detalles por los diversos titulares que integran el Consejo, por lo cual los demandantes están impedidos de impugnar las referidas disposiciones contenidas en éstos a los cuales ellos se sometieron al adquirir sus apartamientos. No tiene razón en virtud de la nulidad de la cláusula en cuestión. Nos explicamos.

Ciertamente la Escritura Matriz constitutiva del Régimen de Propiedad Horizontal establece condiciones y acuerdos a los que se adhieren los adquirentes de los apartamientos individuales mediante su compra. Al respecto hemos señalado que:

> El título constitutivo o escritura pública de una propiedad por pisos o apartamientos individuales dispuesto en los Arts. 22 y ss. de la Ley de Propiedad Horizontal (104 de 25 de junio de 1958—31 L.P.R.A. secs. 1291 y ss) es un estatuto privado que gobierna a los condóminos o titulares, y que una vez inscrito en el Registro de la Propiedad también obliga a tercero. A dicha escritura matriz, salvado el principio del Art. 1207 del Código Civil (31 L.P.R.A. sec. 3372) relativo a las leyes, la moral y el orden público, hemos de acudir para dirimir el conflicto en este caso pues todos y cada uno de los titulares al comprar sus respectivos apartamientos llevaron a efecto un claro acto de adhesión a lo allí estipulado. El título constitutivo de la propiedad en condominio recoge acuerdos y pactos que "tienen un origen plurilateral cuando son establecidos en principio y por convenio por todos los interesados, o pueden tener origen unilateral cuando son establecidos por el propietario único del inmueble antes de dividirlo por pisos, formando un estado de derecho que se acepta sucesivamente por los adquirentes conforme van realizando sus adquisiciones, en cuyo caso nos hallamos más bien ante un contrato de adhesión." Battle Vázquez, *"La Propiedad*

*de Casas por Pisos"*, pág. 65, 3ra. ed., (1956). (Escolio omitido.) *Consejo de Titulares v. Vargas*, supra, págs. 582–583. Véase *Arce v. Caribbean Home Const. Corp.*, supra, pág. 245.

No obstante, consciente de esta situación y ante la importancia socioeconómica y urbanística del régimen, el legislador impuso ciertas limitaciones a la libertad del propietario único de constituir un régimen a su absoluta conveniencia y controlado por él. A tales efectos, exigió ciertas especificaciones que deben constar en la Escritura Matriz. Entre éstas, se encuentran las siguientes:

> La escritura que establezca el régimen de propiedad horizontal *expresará clara y precisamente el uso a que será destinada toda área* comprendida en el inmueble, y una vez fijado dicho uso sólo podrá ser variado mediante el consentimiento unánime de los titulares. (Énfasis suplido.) Art. 2 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1291.
>
> El uso y disfrute de cada apartamiento estará sometido a las siguientes reglas:
>
> (a)Cada apartamiento se dedicará *únicamente* al uso dispuesto para el mismo en la escritura a que se refiere [el artículo 2].
>
> .    .    .    .    .    .    .    .
>
> La infracción a estas reglas dará lugar al ejercicio de la acción de daños y perjuicios por aquel titular u ocupante que resulte afectado, además de cualquier otra acción que corresponda en derecho. (Énfasis suplido.) 31 L.P.R.A. sec. 1291m.

La recurrente estaba obligada por ley a especificar, de forma *clara y precisa*, el uso al que sería destinado cada apartamiento en la Escritura Matriz. Dicho requerimiento fue satisfecho por la recurrente al precisar ciertos usos en la Escritura Matriz *y al especificar otros en el Reglamento, el cual insertó en ésta y se hizo formar parte de ella.*(⁴) Véanse: *Srio. D.A.C.O v. J. Condóminos C. Martí*, supra; *Consejo de Tit. C. Parkside v. MGCI Fin.*

---

(⁴) La Ley de la Propiedad Horizontal requiere que el reglamento para la administración del inmueble *se inserte o se agregue* a la escritura de conversión. 31 L.P.R.A. sec. 1293. Se trata aquí de un caso en que los *usos* que la ley requiere se especificaron aún más en el Reglamento el cual se insertó en la escritura al hacerse formar parte de ésta. Véase la parte V de la opinión.

*Corp.*, supra. Las reservas hechas por la recurrente en la Escritura Matriz, para retener el derecho *a variar unilateralmente el uso de los apartamientos*, resultan a esos efectos contrarias a las claras disposiciones de ley. La fuerza vinculante de los pactos y las condiciones impuestas en la Escritura Matriz o el reglamento no pueden contravenir las disposiciones de ley o ser contrarias a la moral o al orden público. 31 L.P.R.A. sec. 3372; *Consejo de Titulares v. Vargas*, supra. No erró el foro de instancia al decretar la nulidad de la referida cláusula decimotercera (inciso (b)) de la Escritura Matriz.

## V

Ahora bien, en el contexto de la ley ¿constituye la venta del apartamiento 701 a un médico, que interesa dedicarlo a la práctica de la especialidad de la medicina interna, una variación al uso especificado en la escritura? Veamos.

Como hemos expuesto, la Ley de la Propiedad Horizontal requiere que el uso al cual se destine cada apartamiento deberá consignarse de forma clara y precisa en la escritura constitutiva del régimen. Esto constituye una limitación de las facultades inherentes al uso y disfrute de cada apartamiento que se le impone al titular individual, en interés de la colectividad. E. Vázquez Bote, *Derecho Civil de Puerto Rico*, San Juan, Eds. FAS, 1974, T. II, pág. 275. Sin embargo, la ley no dispone unos usos particulares ni categoriza los usos a los que pueden destinarse los apartamientos particulares suceptibles de aprovechamiento individual. Dicha determinación queda a la sana discreción del propietario o propietarios que someten el inmueble al Régimen de Propiedad Horizontal, salvando las disposicio-

---

Claro está, dicho reglamento puede ser modificado por dos terceras partes (2/3) de los titulares o de titulares y porcentajes de participación en los elementos comunes del inmueble, conforme lo dispone el Art. 37 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1293a, *cosa que aquí no ocurrió*. Las enmiendas a la Escritura Matriz propiamente requieren la unanimidad de los titulares.

nes del Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, respecto a las leyes, a la moral y al orden público.

Basta con que se precisen e identifiquen claramente ciertas clases de usos en términos amplios y por definiciones de categorías como vivienda o uso comercial, *y que informen debidamente y sin ambigüedades* a los nuevos adquirentes y terceros, para que éstos sepan a qué atenerse con respecto a los usos previstos para los diversos apartamientos susceptibles de aprovechamiento individual que conforman el inmueble. Se trata de dar aviso suficiente para que la determinación que hacen éstos, como consumidores, al adherirse al estado de derecho creado en la Escritura Matriz sea una determinación informada e inteligente. Véanse: Hernández Denton, *supra*, págs. 265-266; *Consejo Tit. C. Parkside v. MGCI Fin. Corp.*, supra. *El criterio más importante al determinar si la designación de un uso cumple con la ley es que informe debidamente y sin ambigüedades* a los nuevos adquirentes y terceros.

Ahora bien, el hecho de que la ley permita una particularización del uso en términos amplios o por definiciones de naturaleza categórica no implica que el titular original no pueda consignar el uso o destino de los apartamientos en términos específicos. *De así* hacerlo, está obligado por el estado de derecho *que crea mediante la escritura de conversión del inmueble al Régimen de Propiedad Horizontal* y del reglamento que se le inserte o se agregue a ésta. Véanse: *Arce v. Caribbean Home Const. Corp.*, supra; *Consejo Tit. C. Parkside v. MGCI Fin. Corp.*, supra; *Ortiz v. Junta*, supra.

De surgir dudas en cuanto a la especificidad de los usos consignados en la Escritura Matriz, debemos atender a la voluntad de las partes al consignar éstos en la escritura y al adquirir los apartamientos en cuestión. 31 L.P.R.A. sec. 3471. Véase *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983).

En el caso de autos, la intención de la recurrente evidenciada en la Escritura Matriz y *el Reglamento* insertado a la misma fue la de desarrollar un concepto de centro de servicios médico-hospitalarios muy particular en el cual la recurrente retuvo una participación de alrededor de un setenta y cinco porciento (75%) de la superficie total del inmueble, la cual destinaría a proveer toda una infraestructura de facilidades, equipos, servicios médicos y estacionamiento a los adquirentes de los apartamentos restantes, a quienes *se les garantizaría la exclusividad en la prestación de servicios en el área particular de la medicina a la cual se dediquen. Este elemento de exclusividad, consignado en el Art. 33 del Reglamento insertado en la escritura, fue determinante en la voluntad de los demandantes al adquirir sus apartamientos.* Éste implica el entendimiento de que los usos a los cuales se destinarían los apartamientos serían los consignados de forma *específica* en los documentos constitutivos del régimen con la intención de garantizar la *exclusividad y de evitar la interferencia entre la práctica de la medicina a la cual se dedican los diversos titulares.*

Obsérvese que el Reglamento al ser insertado y al formar parte en este caso de la Escritura Matriz en virtud de la cláusula vigésimosegunda de la escritura y al *especificar* el uso de los apartamientos destinados a oficinas médicas, limitó aún más el concepto más amplio de "oficinas médicas" expresado en la Escritura Matriz.(⁵)

*El caso sería otro, si tanto en la escritura como en el reglamento incorporado a ésta, el uso como oficinas médicas no se hubiera limitado por el lenguaje específico que tiene este Reglamento.* Resolvemos que el uso dispuesto

---

(⁵) *Quaere* si estos usos específicos incorporados a la escritura pueden ser variados por las mismas razones y bajo las mismas circunstancias que permiten modificar o extinguir las condiciones impuestas mediante la constitución de servidumbres en equidad. Véanse: *Colón v. San Patricio Corporation,* 81 D.P.R. 242 (1959); *Asoc. V. Villa Caparra v. Iglesia Católica,* 117 D.P.R. 346 (1986); *Olmeda Nazario v. Sueiro Jiménez,* 123 D.P.R. 294 (1989); *Luan Investment Corp. v. Román,* 125 D.P.R. 533 (1990).

para el apartamiento 701 no es un uso general para oficina médica y sí el uso específico de oficina para la especialidad de la cirujía general y pediátrica, tal y como surge literalmente del reglamento que se hizo formar parte de la Escritura Matriz.

## VI

Réstanos determinar si erró el foro de instancia al declarar nulo el Art. 33(d) del Reglamento. Resolvemos que no erró dicho foro al actuar así.

El inciso (d) de dicho artículo dispone que *sólo* se permitirá que un apartamiento sea utilizado para la práctica de la medicina en un área o especialización distinta a la especificada en el Reglamento *con el consentimiento expreso y escrito de la Corporación P.R.F., Inc. y, además, del titular del apartamiento que hubiere sido destinado a dicha especialización*. Tal disposición viola el Art. 37 de la Ley de la Propiedad Horizontal, 31 L.P.R.A. sec. 1293a. Si bien tal disposición no faculta a la recurrente a variar unilateralmente el uso dispuesto para los apartamientos en el reglamento, *ésta le confiere un poder de veto a ella y al titular del apartamiento destinado a la especialidad en controversia, aun cuando dos terceras partes de los titulares, o del titular y porcentajes de participación en los elementos comunes del inmueble, según sea el caso, decida enmendar el Reglamento para cambiar este uso específico*. Bajo tal disposición, si dos terceras partes de los titulares aprueban enmendar el reglamento para cambiar su uso específico, dentro de lo permitido por la ley y la Escritura Matriz, y la recurrente o el titular del apartamiento destinado a esa especialización no dan su consentimiento expreso y por escrito, no se puede enmendar el Reglamento.

Permitir lo anterior, implicaría, además, que se puedan imponer requisitos adicionales al único de dos terceras partes requerido por la ley para enmendar el Reglamento.

Por los fundamentos expuestos, *confirmamos la sentencia del tribunal de instancia que declaró nula la cláusula 13(b) de la Escritura Matriz y el Art. 33(d) del citado reglamento del inmueble que nos ocupa por ser contrarias a la Ley de la Propiedad Horizontal.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Rebollo López no intervino.