*907 TEXTO COMPLETO DE LA SENTENCIA
La recurrente, Sra. Ruth Montes Hernández, nos solicita la revisión de la resolución emitida por la Oficina de Etica Gubernamental (OEG) que le impuso una multa administrativa de $30,000 por violaciones al Artículo 3.2(c) de la Ley de Etica Gubernamental, 3 L.P.R.A. sec. 1822(c). Luego de recibir el escrito de oposición de la OEG, expedimos el auto de revisión para evaluar con más detenimiento los planteamientos de las partes, y ordenamos se elevase copia certificada de los autos del caso a nivel administrativo.
Luego de considerar los planteamientos formulados por la recurrente, así como la oposición a éstos de la OEG, procedemos a modificar la sanción impuesta, por ser la misma excesiva y desproporcionada en relación a la querella, particularmente tomando como criterio razonable la sanción que la propia ley habilitadora de la OEG sugiere. Así modificada, se confirma la resolución recurrida.
A
Toda vez que es necesario tener un cuadro completo de las distintas incidencias procesales que dieron lugar a la resolución recurrida, las cuales surgen en detalle de la oposición a la expedición del auto de revisión y que están sostenidas por los documentos que forman parte del apéndice del recurso y de la transcripción de los procedimientos, a continuación las recogemos:

"1- El 5 de octubre de 1998, la OEG radicó una querella contra la aquí querellada-recurrente por violaciones al Artículo 3.2 (c) de la Ley de Etica Gubernamental del Estado Libre Asociado de Puerto Rico, Ley Núm. 12 de 24 de julio de 1985, según enmendada. Los hechos imputados en la querella se referían a la utilización de una tarjeta de crédito oficial para el uso personal de la querellada. Copia de la querella le fue diligenciada a la aquí querellada-recurrente personalmente el 13 de noviembre de 1998. (Véase, Apéndice de la parte querellada-recurrente, a las págs. 1-3, 8-9.)

2- Transcurrido alrededor de un mes desde el diligenciamiento de la querella sin que la querellada-recurrente hubiese contestado la querella, el 22 de diciembre de 1998, la Oficial Examinadora le concedió un término de 20 días a la parte querellada-recurrente para presentar su contestación a la querella. (Véase Apéndice de la parte querellada-recurrente a la pág. 9.)

3- Asimismo, el 15 de enero de 1999, ante el incumplimiento de la querellada-recurrente con las órdenes de la Oficial Examinadora y ante la falta de la presentación de una contestación a la querella, la parte querellante solicitó se le anotara la rebeldía a la querellada.

4- El 10 de febrero de 1999, acreditada la incomparecencia de la querellada-recurrente y la falta de una contestación a la querella, la Oficial Examinadora le anotó la rebeldía a la parte querellada-recurrente. Asimismo, señaló la vista adjudicativa del caso para el 29 de marzo de 1999. Se archivó en autos copia de la notificación de dicha orden el 18 de febrero de 1999. (Véase Apéndice de la parte querellada-recurrente, a la pág. 18)

5- Cabe señalar que copia de cada una de las órdenes emitidas por la Oficial Examinadora le fue remitida a la parte querellada-recurrente a su dirección de récord en el Condominio Garden Hills, Plaza Norte I, Apto. 105, Guaynabo, Puerto Rico, 00966.

6- Así las cosas, el 16 de febrero de 1999, la Secretaria de la OEG recibió una comunicación de la querellada-recurrente fechada el 11 de febrero de 1999, donde, en síntesis, admitió los hechos alegados y solicitó un término adicional para someter su contestación a la querella. Del sobre en el cual llegó dicha comunicación, surge que la dirección de la querellada era en efecto, aquélla a la cual la OEG le estaba remitiendo todas las órdenes y escritos, a saber: Condominio Garden Hills Plaza I, Apto. 105, Guaynabo, P.R. 00966. (Véase Apéndice de la parte querellante-recurrida a la pág. 27)

*908 7- Atendida la comunicación de la querellada-recurrente, el 19 de febrero de 1999, la Oficial Examinadora dejó sin efecto la anotación de rebeldía, le concedió 10 días adicionales a la querellada para someter su contestación a la querella, y convirtió la vista adjudicativa pautada para el 29 de marzo en una conferencia sobre el estado de los procedimientos.

8- El 8 de marzo de 1999, compareció nuevamente la querellada-recürrente aceptando ciertas alegaciones de la querella. La dirección que aparecía en el sobre de dicha comunicación era la misma a la cual se le estaba remitiendo todas las órdenes de la Oficial Examinadora. (Véase Apéndice de la parte querellada-recurrente a la pág. 24-26)

9- A sólo tres días de celebrarse la conferencia sobre el estado de los procedimientos, el 26 de marzo de 1999, la querellada presentó personalmente una comunicación a manuscrito solicitando la suspensión de la conferencia. (Véase, Apéndice de la parte recurrente a las págs. 28-30.)

10- A tono con dicha solicitud, ese mismo día, 26 de marzo de 1999, la Oficial Examinadora reseñaló la conferencia sobre el estado de los procedimientos para el 12 de mayo de 1999.

11- El 12 de mayo de 1999, se celebró la conferencia sobre el estado de los procedimientos ante la Oficial Examinadora, en la cual estuvieron presentes la parte querellada-recurrente y la parte querellante. En dicha conferencia, las partes informaron que se habían reunido con el propósito de transigir la querella y a petición de ambas partes, la Oficial Examinadora concedió 45 días para llegar a un acuerdo transaccional. Advirtió la Oficial Examinadora que de no llegarse a tal acuerdo, la querellada tendría 10 días para presentar formalmente la contestación a la querella. (Véase, Apéndice de la parte querellada-recurrente a las págs. 32-33 y Apéndice de la parte querellante-recurrida a las págs. 6-8).

12- En dicha conferencia, la Oficial Examinadora orientó a la querellada sobre su derecho a una representación legal y sobre las instituciones que prestan servicios legales gratuitos a personas carentes de capacidad económica para contratar representación legal. (Véase, Apéndice de la parte recurrente, a la pág. 33 y Apéndice de la parte querellante-recurrida a las págs. 8-10.

13- Transcurrido los 45 días otorgádoles a las partes para que sometieran su acuerdo de transacción sin que el mismo hubiese sido sometido, el 24 de agosto de 1999, la Oficial Examinadora le ordenó a la querellada-recurrente a someter su contestación a la querella dentro de los próximos 10 días laborables. Igualmente, citó a las partes para una conferencia sobre el estado de los procedimientos a celebrarse el 13 de septiembre de 1999. Al igual que todas las demás órdenes, dicha orden le fue remitida a la querellada-recurrente a su dirección de récord en el Condominio Garden Hills Plaza, Torre I, Apto. 105, en Guaynabo, P.R. 00966.

14- Llamado el caso para la conferencia sobre el estado de los procedimientos, compareció la parte querellante, no así la querellada-recurrente. A preguntas de la Oficial Examinadora, la parte querellante expresó que no habían tenido comunicación con la querellada. Así las cosas, la Oficial Examinadora expresó que se notificó a la querellada sobre la celebración de dicho procedimiento mediante correo regular a su dirección de récord y que la misma no fue devuelta por el correo. Acto seguido, la Oficial prosiguió a pautar la Conferencia con Antelación a la Vista para el 3 de diciembre de 1999. Se le apercibió a la parte querellada que de no comparecer a la Conferencia señalada, ello podría dar lugar a que se le anotase la rebeldía. La Minuta de dicha conferencia le fue notificada a la querellada por correo regulara la dirección de récord. (Véase, Apéndice de la parte querellada-recurrente a la pág. 35. )

15- Así las cosas, el 2 de diciembre de 1999, la parte querellante presentó una Moción Informativa, señalándole a la Oficial Examinadora que a pesar de las gestiones realizadas no pudieron comunicarse con la querellada, ni tampoco lograron determinar su paradero aun cuando indagaron, incluso, en la Autoridad de Puertos.

*909 16- El 3 de diciembre de 1999, se celebró la Conferencia con Antelación a la Vista Adjudicativa, a la cual compareció únicamente la parte querellante, La Oficial Examinadora anotó, por segunda vez, la rebeldía a la querellada. (Véase, Apéndice de la parte querellada-recurrente a la pág. 46.)

17- En dicha fecha, 3 de diciembre de 1999, la Oficial Examinadora emitió una Orden donde señaló la Vista Adjudicativa del caso para el 29 de diciembre de 2000. Dicha Orden le fue notificada a la querellada por correo regular a su dirección de récord, no siendo la misma devuelta por el correo. (Véase, Apéndice de la parte querellada-recurrente a las págs. 47-48.)

18- Así las cosas, el 29 de diciembre de 1999 se celebró la vista adjudicativa en rebeldía. La Oficial Examinadora admitió en evidencia seis exhibits sosteniendo a la conducta imputada en la querella. (Véase, Apéndice de la parte querellada-recurrente a las págs. 49-50.)

19- El 3 de marzo de 2000, el Director Ejecutivo de la OEG emitió uña Resolución acogiendo las recomendaciones emitidas por la Oficial Examinadora en su Informe de 28 de febrero de 2000. En esta Resolución concluyó que la querellada había incurrido en 30 violaciones al Artículo 3.2(c) de la Ley de Etica Gubernamental y le impuso la multa administrativa de $1,000.00 por cada violación. La Resolución fue notificada a la querellada a su dirección de récord por correo regular el 6 de marzo de 2000. (Véase, Apéndice de la parte querellada-recurrente a las págs. 51 a 68.)

20- El 27 de marzo de 2000, la querellada presentó una Moción de Reconsideración solicitando se dejara sin efecto la Resolución de 3 de marzo.

21- El 31 de marzo de 2000, el Director Ejecutivo de la OEG emitió una Resolución en la que denegó la Reconsideración solicitada. Dicha Resolución fue notificada el 3 de abril de 2000.

22- El 3 de mayo de 2000, la recurrente presentó el recurso de epígrafe, en el que solicita a este Honorable Tribunal que revise la Resolución de 31 de marzo de 2000, que confirmó la Resolución de 3 de marzo de 2000...".

En la resolución de la Oficial Examinadora de la OEG se formulan las siguientes determinaciones de hechos:

“1- El 12 de diciembre de 1983, la Autoridad de los Puertos de Puerto Rico reclutó a la Sra. Ruth Montes Hernández para ocupar el puesto de Oficial de Comunicaciones y Prensa. (Exhibit I de la parte querellante, Certificación de la Autoridad de los Puertos del 27 de mayo de 1998.

2- El 23 de junio de 1995, la señora Montes Hernández fue nombrada al puesto de confianza de Jefe de la Oficina de Comunicaciones y Prensa de la Autoridad de los Puertos, el cual ocupó hasta el 6 de mayo de 1998. (Exhibit I, supra).

3- El 14 de enero de 1997, la señora Montes Hernández solicitó al Director Ejecutivo de la Autoridad de los Puertos, el Sr. Herman Sulsona, una tarjeta de crédito para la Oficina de Comunicaciones y Prensa de la Autoridad. (Exhibit IIA de la parte querellante, Carta de la señora Ruth Montes de 14 de enero de 1997).

4- El propósito de la solicitud de la tarjeta de crédito fue facilitar el alquiler de autos y gastos ordinarios en los hospedajes para actividades "en el exterior". (Exhibit II A, supra).

5- El 27 de enero de 1997, la Autoridad de los Puertos solicitó al Banco Popular de Puerto Rico la expedición de una tarjeta de crédito corporativa Visa Gold Núm. 4549-2500-0642-8057, a nombre de la Sra. Ruth E. Montes para uso en gestiones oficiales de su cargo con una línea de crédito de $5,000 a $25,000. (Exhibit II B de la parte querellante, Carta del Director Ejecutivo de la Autoridad de los Puertos al Banco Popular de Puerto Rico).

*910
6- Con la solicitud la Autoridad de los Puertos se comprometió al pago de los gastos incurridos mediante el uso de la tarjeta. (Exhibit IIB, supra).

7- Durante los años 1997 y 1998, y como parte de sus junciones oficiales, la señora Montes Hernández fue autorizada a asistir a varias conferencias en los Estados Unidos para las cuales emitieron las órdenes de viaje que se desglosan a continuación:

a- Convención Anual Seatrade 1997-11 al 5 de marzo de 1997

b International Air Cargo Conference & Exhibits en el Indiana Convention Center- 6 al 10 de mayo de 1997

c- Florida Caribbean Cruise Assoc. Conference- 22 al 25 de octubre de 1997

d- Seminario de Inversiones en New York City-1 al 3 de diciembre de 1997

e- Presentación del Director Ejecutivo ante "Global Paorts, Airports & Carriers Summit 98"- 21 al 22 de enero de 1998

f- Presentación Autoridad de los Puertos ante la American Asocciation of Port Authority- 22 al 24 de marzo de 1998".

Estas órdenes de viaje fueron aprobadas por el Sr. Herman Sulsona, ex Director Ejecutivo de la Autoridad de los Puertos o el Sr. Saúl Serrano, quien se desempeñaba como Director de Servicios Administrativos de la Autoridad de los Puertos. (Exhibit V de la parte querellante, órdenes de viaje).

8- Entre las fechas del 30 de marzo de 1997 al 27 de abril de 1998, la señora Montes Hernández utilizó la tarjeta de crédito corporativa de la Autoridad de los Puertos para realizar treinta (30) transacciones relacionadas a los siguientes gastos personales:

DESCRIPCION DEL CONCEPTO O LUGAR - FECHA DE CONSUMO - IMPORTE DE CONSUMO

Westin Rio Mar F. Palmer 30-MAR-97 $ 45.50

Westin Río Mar P. Palmer 31-MAR-97 $807.25

Nat'tl. Law/Leadership, Boca Ratón, FI. 24-JUN-97 $772.50

Conquistador Resort 04-AGO-97 $348.95

Fajardo 05-AGO-97 $ 30.00

Ticket Print- Santurce 07-OCT-97 $186.00

Ticket Print Santurce 08-OCT-97 $ 62.00

London Fog PR, Tampa, FI. 24-NOV-97 $ 64.00

Kazual, Guaynabo 25-NOV-97 $ 63.96

Modavida, Hato Rey 25-NOV-97 $174.00

Hoi Xmas Rnd The World 28-NOV-97 $274.45

*911
J.C. Penney 30-NOV-97 $ 79.95

Vidal Sasson #20 NY02-DIC-97 $ 70.72

Macy's East 003 NY 03-DIC-97 $ 55.21

Designer Collection, Río Piedras 15-D1C-97 $135.00

Modavida, Hato Rey 20-DIC-97 $ 84.00

Preciosa, Caparra, PR. 21-DIC-97 $ 83.50

Clubman San Patricio 21-DIC-97 $ 90.00

Arrivederci, Guaynabo 27-DIC-97 $ 33.90

Looks Boutique, Guaynabo 31-DIC-97 $260.95

San Juan Hotel 06-ENE-98 $ 60.00

Pizzeria Uno San Juan 16-ENE-98 $ 41.85

Tutto Donna, Miami 22-ENE-98 $57.51

Miami Men's Wear 22-ENE-98 $138.45

Casatrón, Santurce 11-FEB-98 $172.00

London fog PR, Tampa, FI. 21-MAR-98 $ 89.00

Margaritas Mexican, Inc. 07-ABR-98 $ 28.60

K-Mart ll-ABR-98 $ 33.28

Ticket Print 15-ABR-98 $114.00

Roma 27-ABR-98 $ 53.00

(Exhibit IV de la parte querellante, Informe de Intervención 97-98(C)-056 del 14 de mayo de 1998 por Guillermo M. Vaello Pérez, Auditor General de la Oficina de Auditores Internos de la Autoridad de Puertos.)

9- La cantidad de gastos personales incurridos por la señora Montes Hernández para este período ascendió a $4,509.53. (Exhibit IV, supra)

10- De los $4,509.53, la señora Montes Hernández pagó o reembolsó a la Autoridad de los Puertos parte de la deuda, dejando un balance de $2,426.59 más los intereses acumulados. (Exhibit IV, supra.)

11- El 12 de junio de 1999, la Autoridad de los Puertos incoó contra la querellada una acción civil en cobro de dinero ante el Tribunal de Primera Instancia de Puerto Rico, Subsección de Distrito, Sala de San Juan, Autoridad de los Puertos v. Ruth E. Montes Hernández, Civil Núm. KCM99-0934 (Exhibit VI de la querellante, Copia de Demanda)."
*912 La Oficial Examinadora recomendó la imposición de una sanción monetaria ascendente a treinta mil dólares ($30,000), la cual fue acogida e incorporada en la resolución de 3 de marzo de 2000 emitida por el Director Ejecutivo de la OEG.
La recurrente presentó una moción de reconsideración o relevo de resolución, la cual fue declarada no ha lugar.
En su escrito de revisión, la recurrente aduce que la OEG abusó de su discreción al no reconsiderar o relevarla de los efectos de la resolución de 3 de marzo de 2000. En el segundo señalamienuo de error, sostiene que la multa impuesta, ascendente a $30,000, viola el Artículo 3.8 (b) (3) de la Ley de Etica Gubernamental, 3 L.P.R.A. see. 1828 (b) (3). La OEG nos presentó su oposición a la expedición del auto. En atención a los escritos presentados ante este Foro, expedimos el auto de revisión, para evaluar con más detenimiento los planteamientos de las partes y ordenamos se elevase copia certificada del expediente administrativo. Estando en posición de resolver, procedemos a ello.
B
En relación al primer señalamiento de error, hemos examinado detenidamente los argumentos expuestos por la peticionaria y los mismos no justifican la revocación de la resolución recurrida. Somos conscientes de que existe una política pública judicial a los efectos de que los casos se vean y resuelvan en sus méritos. Echevarría Jiménez v. Sucn. Pérez Meri, 123 D.P.R., 664, 673 (1989); Garriga Gordils v. Maldonado Colón, 109 D.P.R. 817, 822-823 (1980). Ahora bien, un análisis ponderado de las circunstancias procesales del caso de autos demuestra que la peticionaria no desplegó el interés necesario en la dilucidación del mismo. Ante la desatención al caso y los procedimientos pautados, procedía que se ventilase la querella que pesaba en su contra en rebeldía por su incomparecencia a la vista señalada. No cabe duda de que el caso revestía de un interés público para que se ventilase, sin dilaciones innecesarias o injustificadas. Por tal razón consideramos que la OEG no abusó de su discreción en celebrar la vista, sin la presencia de la recurrente, y resolver conforme la prueba presentada.
Por otro lado, la recurrente aduce que no recibió la notificación del señalamiento de la vista que se celebró. Sin embargo, las órdenes, minutas y señalamientos de vista fueron notificadas a la misma dirección informada por ella y las mismas no fueron devueltas por el correo federal. Tampoco acreditó en forma fehaciente, ya fuese mediante declaración jurada o de otra forma, ante el organismo administrativo que, en efecto, no recibió la notificación. Esto es, la recurrente se limitó a informar a través de su abogado, que no recibió la notificación de vista, pero no refutó la presunción controvertible que puesta en el correo el sobre conteniendo la notificación de la vista, ella la recibió oportunamente. Regla 16(24) de Evidencia, 32 L.P.R.A. Ap. IV, R. 16 (24). No se cometió el primer error señalado.
C
En la discusión del segundo señalamiento de error, la recurrente aduce que la penalidad impuesta es de una magnitud excesiva. Por su parte, la OEG argumenta que tal no es el caso, pues bajo la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), el Director de la OEG tiene discreción para imponer una penalidad de cinco mil dólares ($5,000) por cada uso indebido de la tarjeta de crédito, para un total de ciento cincuenta mil dólares ($150,000), y en vez de ello le impuso sólo mil dólares ($1,000) por uso, para un total de treinta mil dólares ($30,000).
La recurrente nos argumenta a base del Art. 3.8(b) (3) de la Ley de Etica Gubernamental, 3 L.P.R.A. see. 1828, el cual dispone las siguientes sanciones y remedios aplicables en caso de violación a las prohibiciones incluidas en dicha ley:

"§ 1828. Sanciones y remedios.

(a) Acciones de naturaleza penal.

*913 (i) • • •

(b) Acciones de naturaleza civil.

(1) La Oficina tendrá facultad para solicitar del Tribunal de Primera Instancia la expedición de un interdicto para impedir cualquier violación de este subcapítulo e interponer las acciones que procedan para cobrar las sanciones civiles que se impongan a favor del Estado.

(2) La Oficina podrá acudir al Tribunal de Primera Instancia para solicitar que se impida, suspenda o paralice la ejecución de cualquier acción oficial que constituya una violación a las prohibiciones que establece este subcapítulo.

(3) Toda persona que reciba un beneficio económico como resultado de la violación de este subcapítulo vendrá obligado a pagar al Estado, como sanción civil por su incumplimiento, una suma equivalente a tres (3) veces el valor del beneficio económico recibido. (Enfasis suplido.)

(4) La violación de cualquiera de las disposiciones de este subcapítulo puede ser penalizada, en los casos aplicables, con cualquiera de las siguientes sanciones administrativas impuestas por la autoridad correspondiente:

(A) Amonestación escrita.

(B) Suspensión de empleo y sueldo.

(C) Destitución o despido."

La OEG fundamenta su posición a base de lo dispuesto en la Sección 7.1 de L.P.A.U., 3 L.P.R.A. see. 2201. La referida sección dispone como sigue:

"§ 2201. Multas administrativas.

Toda violación a las leyes que administran las agencias o a los reglamentos emitidos al amparo de las mismas, podrá ser penalizada con multas administrativas que no excederán de cinco mil (5,000) dólares por cada violación.

En caso de que la ley especial de que se trate sólo provea penalidades criminales, el jefe de la agencia, a su opción, podrá radicar una querella al amparo de esta sección para procesar el caso por la vía administrativa.

Si la ley especial de que se trate dispone una penalidad administrativa mayor a la que se establece en esta sección, la agencia podrá imponer la penalidad mayor."

Al considerar la imposición de sanciones es necesario tener presente la totalidad del expediente administrativo. En el caso de autos se determinó que la recurrente utilizó la tarjeta de crédito en treinta (30) ocasiones para asuntos personales, totalizando la suma de $4,509.53. LaJSra., Montes Hernández fue sometiendo pagos directamente al Banco Popular de.P.R., quien era el acreedor de la tarjeta de crédito, por las cantidades cargadas indebidamente, de forma tal que según la resolución recurrida, la suma adeudada ascendía a $2,426.59. 
Según señalado en el resumen del aspecto procesal antes presentado, la participación de la recurrente en los procedimientos administrativos fue parcial y no envolvió el uso de representación legal, ya que la primera comparecencia de ésta, representada por abogado, fue la solicitud de reconsideración o relevo. La participación *914 de la Sra. Montes Hernández se limitó a presentar tres cartas, reunirse con la parte recurrida con el propósito de lograr un acuerdo transaccional, y atender una vista sobre el estado de los procedimientos.
En la carta del 16 de febrero, la recurrente, en esencia, alegó: (1) desconocimiento de que la tarjeta no podía ser usada para propósitos personales; (2) que ella mensualmente hacía pagos a dicha cuenta; y (3) que siempre reconoció la deuda como una personal. En ésta señala como evidencia sus informes financieros a la OEG en los que aparecía detallada como una deuda personal lo que ella adeudaba en la tarjeta. Indicó que se comprometía a tramitar un plan de pago para saldar la deuda relacionada con la tarjeta tan pronto comenzara a trabajar de nuevo y que estaba tramitando el reembolso de sus aportaciones al sistema de retiro para saldar dicha deuda. Añadió que su vergüenza al encontrar su caso reportado en los periódicos, le afectó su salud física y mental de tal forma que tuvo que renunciar a su plaza en la Autoridad, a pesar de llevar 15 años trabajando para dicha entidad.
En la segunda carta, de 5 de marzo de 1999, la recurrente añadió que el 15 de marzo de 1998, había renunciado a su posición de confianza en la Autoridad, regresando a su posición de carrera, y que el 31 de octubre de 1998, renunció como empleada, quedando desde esa fecha desempleada. Reiteró que mensualmente hacía pagos al Banco con relación a sus gastos personales y que en los estados financieros que sometía a la OEG reflejaba lo adeudado en la tarjeta como una deuda personal. Finalmente expresó que nunca ocultó el uso personal de la tarjeta, que nunca fue su intención violar la ley.
En su carta de 26 de marzo de 1999, solicitó una posposición de la próxima vista debido a que la terminación abrupta de su relación de cinco años con su pareja le había causado gran angustia y puesto en una situación emocional tal que había tenido que buscar ayuda profesional.
La minuta de la vista de 12 de mayo de 1999, indica que la recurrente compareció personalmente y que las partes ya se habían reunido para discutir la posibilidad de llegar a un acuerdo transaccional, por lo que solicitaron el término de 45 días para informar si los esfuerzos transaccionales habían culminado exitosamente, o si se proseguiría con los procedimientos.
Otro hecho pertinente que se desprende del expediente, es que cuando la recurrente llevaba varios meses desempleada, el 9 de julio de 1999, la Autoridad de los Puertos presentó una demanda en cobro de dinero contra la Sra. Montes Hernández, por lo cargado a la tarjeta de crédito.
Al considerar el resumen procesal, las determinaciones de hechos formuladas por la oficial Examinadora y la participación de la recurrente en el proceso, nos encontramos con una situación fuera de lo usual, que requiere ponderar cuidadosamente los planteamientos de las partes. Según concluimos al examinar el primer señalamiento de error, la OEG le proveyó suficientes garantías procesales a la recurrente, por lo que es válido el procedimiento seguido para la determinación de que ésta incurrió en violación a las normas establecidas al amparo de la Ley de Etica Gubernamental. El reclamo de la recurrente al efecto de que desconocía que utilizar la tarjeta para fines personales estaba prohibido, es inmeritorio. Sobre este particular, no es necessario abundar, pues la decisión de la OEG es clara y correcta.
Ahora bien, debemos tener en cuenta, para fines de la sanción, que la recurrente no ocultó el uso personal que le dio a la tarjeta. Del récord administrativo se desprende que ella hizo pagos directamente al Banco y alegó, además, que incluía dicha deuda en sus informes a la OEG.
El que la recurrente hubiese sometido pagos directamente al banco, no la excusa por violación a las normas. Sin embargo, ello tiende a demostrar que no existió intención de. defraudar. Al ser confrontada con la situación, no negó los hechos, sino que a pesar de estar desempleada hizo gestiones para llegar a un acuerdo transaccional. Ello nos tiende a demostrar que no estamos ante una actitud obstinada y contumaz, sino ante alguien que utilizó la tarjeta de crédito destinada para uso oficial en asuntos personales, pero reconoce que es responsable de *915 dichos cargos.
Ante el señalamiento de que la sanción en el caso de autos resulta excesiva, la OEG no ha justificado su monto global, salvo exponer que se ajusta a lo provisto en la Sec. 7.1 de la L.P.A.U., supra. En tal exposición, la OEG ni siquiera hizo una comparación de la situación planteada con otros casos, a fin de demostrar la razonabilidad de la sanción impuesta. Esto es, que la misma descansa sobre una base uniforme determinable, que no es producto del capricho, arbitrariedad o el abuso de la discreción.
En cuanto a disposiciones reglamentarias, el Art. 22 del Reglamento Núm. 4827 de 23 de noviembre de 1992, conocido como Reglamento de Etica Gubernamental, dispone en parte, como sigue:
"ARTICULO 22. SANCIONES

(A) Si el Director... determina... que se ha incurrido en uno o más de los delitos graves...

(B) Cualquier violación a las disposiciones de la Ley, de los reglamentos y normas emitidas al amparo de la misma que conlleve sanciones de naturaleza penal, podrá, a discreción del director, ser procesada en la oficina por la vía administrativa de conformidad con lo establecido en la Sección 7.1 de la Ley Núm. 170, citada.

(C) Cualquier violación a las disposiciones de la Ley, así como de los reglamentos y normas al amparo de la misma, podrá ser penalizada con multas administrativas que no excederán de cinco mil dólares ($5,000) por cada violación, según la Ley Núm. 170, citada.

(D) El Director podrá imponer a toda persona que reciba algún beneficio económico como resultado de la violación de cualquiera de las disposiciones de la Ley, así como de los reglamentos y normas emitidas al amparo de la misma, desde la restitución hasta una suma equivalente a tres veces el valor del beneficio económico recibido a favor del Estado. (Enfasis suplido.)

(E) Además de las sanciones enumeradas, la violación de cualquiera de las disposiciones de la Ley, así como de los reglamentos y normas emitidas al amparo de la misma, podrá ser penalizada por la autoridad nominadora previa recomendación del Director con las siguientes sanciones administrativas:

1) Amonestación escrita

2) Suspensión de empleo y sueldo

3) Destitución o despido."

Cuando se le otorga a una agencia administrativa el poder de adjudicar controversias, como regla general, también se le concede el poder de imponer sanciones, lo que conlleva discreción para seleccionar la sanción que ayude a cumplir con los objetivos estatutarios, siempre que la agencia obre dentro del marco de su conocimiento especializado y de la ley. Al revisar estas decisiones, los tribunales brindan deferencia al foro administrativo, por razón de su vasta experiencia y el conocimiento especializado que adquiere la agencia en el proceso de la reglamentación correspondiente. Srio. D.A.C.O. v. Junta, 121 D.P.R. 807 (1988).
En la revisión judicial de sanciones impuestas por una agencia administrativa, los tribunales deben brindar deferencia a la sanción impuesta por la agencia, si la decisión está basada en evidencia sustancial, no es ultra vires y tiene relación razonable con los actos que se quieren prohibir. La revisión judicial no dependerá de si la sanción es muy fuerte o no. La determinación de si la sanción es la que corresponde imponer en cada caso, es esencialmente de naturaleza administrativa. En la implantación de la ley y consecución de los objetivos legislativos, es la agencia, y no los tribunales, la que debe determinar cuál es la sanción aplicable en las distintas *916 situaciones fácticas. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R._(1997), 97 J.T.S. 142.
En el ejercicio de la revisión de una sanción impuesta por una agencia administrativa, los tribunales deben evitar que los administradores actúen ilegalmente o cometan arbitrariedades al imponer sanciones. El tribunal debe evaluar si la sanción está sostenida por evidencia sustancial y cuando se demuestra que no hay prueba en el expediente para la sanción o que existe otra en el récord que claramente reduce o menoscaba el peso de la evidencia que sostiene la determinación administrativa, los tribunales pueden revisar la decisión con el fin de impedir situaciones caprichosas. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., supra.
Las agencias administrativas tienen discreción en la selección de las medidas que le ayuden a cumplir los objetivos de las leyes cuya administración e implantación se les ha delegado, siempre que actúen dentro del marco de su conocimiento especializado y de la ley. En estos casos, la revisión judicial no será para determinar si la sanción impuesta guarda proporción con la conducta por la cual se impone la sanción, ni si la sanción es demasiado fuerte. Esta evaluación corresponde hacerla a la propia agencia, quien por su experiencia especializada, es la que está en mejor posición para conocer los efectos de una violación a los intereses protegidos y cuya agencia, al mismo tiempo, asegura cierto grado de uniformidad y coherencia en la imposición de sanciones. Com. Seg. P.R. v. Antilles Ins. Com., 145 D.P.R._(1998), 98 J.T.S. 38.
En esta zona, la revisión judicial se limitará a evitar que las agencias actúen en forma ilegal, arbitraria, en exceso de lo permitido por ley o en ausencia de evidencia sustancial que justifique la medida impuesta, de modo que se evidencia una actuación caprichosa o en abuso de discreción por parte de la agencia. Com. Seg. P.R. v. Antilles Ins. Com., supra. En la revisión judicial de sanciones impuestas por una agencia administrativa, el tribunal no debe sustituir el criterio del administrador por el suyo. Fuertes y otros v. A.R.P.E., 134 D.P.R. 947 (1993).
La justificación presentada por la OEG para la sanción impuesta en el caso de autos, descansa en que se impuso dentro del límite de $5,000 de multa administrativa que la Ley de Procedimiento Administrativo Uniforme provee y que en lugar de sancionar a la recurrente en el máximo provisto, le fijó $1,000 por cada incidente. Tal explicación no es satisfactoria. Si bien no está en controversia el que la Sec. 7.1 de L.P.A.U. le provee a todas las agencias administrativas la facultad de imponer multas administrativas de hasta un máximo de $5,000 por incidente, ésta no es un cheque en blanco para ser utilizado indiscriminadamente, sin referencia a los hechos particulares de cada caso. No podemos adscribirle el alcance mecánico-exponencial que la OEG le atribuye a la Sec. 7.1, supra.
La Ley habilitadora de la OEG y el Reglamento, en sus Arts. 3.8 (b) (3), supra, y el Art. 22 (D), supra, establece, como sanción a toda persona que reciba beneficio económico como resultado de la violación a una norma, una sanción máxima de tres veces el valor del beneficio económico recibido. En vista de que la OEG no justificó adecuada y satisfactoriamente la procedencia de la cuantía de la sanción en el caso de autos y tomando en consideración las guías provistas por la propia ley habilitadora y el reglamento de la OEG, debemos acoger las mismas para la imposición de la sanción en el caso de autos. Esto es, que la sanción sea el equivalente a tres veces el valor total del beneficio económico recibido.
En resumen, concluimos que la OEG se excedió al imponer la sanción en el presente caso, sin atenerse a parámetro válido y uniforme, ni tomar en cuenta los hechos y la limitación del Art. 3.8 (b) (3) y 22 (D) del reglamento. Por lo tanto, la sanción se atemperará a lo antes expuesto.
D
Por las consideraciones anteriores, se modifica la resolución recurrida para que la sanción económica impuesta a la recurrente sea tres veces el monto de los cargos indebidos hechos a la tarjeta de crédito del gobierno, lo que asciende a $13,729.77. Así modificada, se confirma.
*917 Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIO 2002 DTA 44
1. Según la demanda presentada por la Autoridad de los Puertos contra la Sra. Montes Hernández, caso KCM99-0934, luego de ciertos ajustes y tomando en cuenta los cargos por penalidad e intereses, la cantidad adeudada al 9 de julio de 1999 ascendía a $4,049.15. Por otro lado, la recurrente aduce que tiene ciertos créditos contra la cantidad reclamada por la Autoridad.