EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carmiña Alonso Piñero<br><br>Peticionaria<br><br>v.<br><br>UNDARE, Inc.<br><br>Recurrida | Certiorari<br><br>2017 TSPR 171<br><br>198 ____ |

Número del Caso: AC-2016-55

Fecha: 15 de septiembre de 2017

Región Judicial de San Juan, Panel II

Abogado de la parte peticionaria:

      Lcdo. Juan Arsuaga Álvarez

Abogado de la parte recurrida:

      Lcdo. José A. Cuevas Segarra

Materia: Ley de control de tráfico de vehículos de motor y uso de calles: Improcedencia de aplicar la doctrina de incuria o actos propios contra el propietario que rechazó expresamente el establecimiento del régimen de acceso controlado ni se obligó por escrito al pago de la cuota de mantenimiento.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carmiña Alonso Piñero

    Peticionaria

                             AC-2016-0055

      v.

UNDARE, Inc.

     Recurrida

**EL JUEZ ASOCIADO SEÑOR RIVERA GARCÍA emitió la opinión del Tribunal.**

En San Juan, Puerto Rico, a 15 de septiembre de 2017.

En el presente caso el Tribunal de Apelaciones revocó parcialmente una sentencia del Tribunal de Primera Instancia que había determinado que la propietaria de un inmueble no estaba obligada al pago de cuotas de mantenimiento del sistema de control de acceso de su urbanización. Para sostener su conclusión, el foro apelativo razonó que procedía aplicar las doctrinas de incuria y actos propios para sujetarla al pago de las cuotas mencionadas.

Tenemos, pues, la oportunidad de resolver cómo debe brindarse el consentimiento para sujetar al propietario de un inmueble al pago de las cuotas de mantenimiento de un sistema de control de acceso.

Adelantamos que, cuando se trate de un propietario que no autorizó expresamente el establecimiento del régimen de acceso controlado, el titular del inmueble debe comprometerse al pago de las cuotas mediante contrato escrito. Ello, según discutiremos, constituye un requisito de sustancia esencial, *ad solemnitatem,* a los fines de que la obligación surta efectos jurídicos.

De igual manera, a la luz de esta conclusión, debemos determinar si procede aplicar la doctrina de incuria o actos propios contra el propietario que no autorizó el referido sistema ni se obligó por escrito al pago de la cuota de mantenimiento, pero que las pagó durante varios años. Resolvemos que no procede la aplicación de las doctrinas mencionadas al caso de autos. Como consecuencia, se revoca la sentencia del Tribunal de Apelaciones que sujetó a la propietaria del inmueble al pago de cuotas de mantenimiento sin que prestara su consentimiento escrito al régimen de control de acceso ni al pago de las referidas cuotas. Veamos.

## I

El 29 de noviembre de 1984 la Sra. Carmiña Alonso Piñero (señora Alonso Piñero o peticionaria) adquirió, por donación de sus padres, un inmueble localizado en la Urbanización San Francisco de Río Piedras. En ese momento la urbanización no contaba con un sistema de acceso controlado.

Luego de la aprobación de la Ley de Control de Acceso, *infra*, la Urbanización San Francisco solicitó al Municipio

de San Juan su autorización para controlar el acceso mediante su administradora, la Asociación de Residentes de las Urbanizaciones San Francisco, Santa María y San Ignacio (UNDARE). El 12 de septiembre de 1995 el Municipio emitió un dictamen preliminar para autorizar el sistema, el cual fue autorizado posteriormente por 3/4 partes o más de los propietarios de los inmuebles sitos en la urbanización.[1] No surge que la señora Alonso Piñero hubiera autorizado por escrito el cierre de la urbanización en aquel momento.

Ahora bien, a partir de 1993 el señor Carlos Alonso, padre de la peticionaria y quien residía junto a ésta en el inmueble en cuestión, decidió contribuir con los gastos de mantenimiento de UNDARE "hasta un máximo de $50.00 mensuales".[2] Con el fin de plasmar dicho acuerdo, dos años más tarde suscribió bajo juramento ante notario público un *Certificado de Aceptación/Adopción*. En éste afirmó ser el dueño de la propiedad y no tener objeción de que se implementara el control de acceso según el dictamen preliminar del Municipio.[3] Conforme se había comprometido, el señor Carlos Alonso pagó $ 50.00 mensuales hasta su fallecimiento el 14 de junio de 2001.[4]

Así las cosas, una vez falleció su padre, la señora Alonso Piñero continuó con el pago de las cuotas de

---

[1] *Resolución Núm. 14* aprobada el 12 de septiembre de 1995, Serie 1995-1996, Apéndice de la apelación civil, págs. 351-359.

[2] Véanse: *Escrito de apelación civil*, pág. 4; Misiva del señor Carlos Alonso dirigida a UNDARE de 14 septiembre de 2000, Apéndice de la apelación civil, pág. 166; *Sentencia*, íd., págs. 463 y 470.

[3] *Certificado de Aceptación/Adopción*, íd., pág. 137.

[4] *Certificación de defunción*, íd., pág. 238.

mantenimiento.[5] De igual manera, asistió a las asambleas ordinarias de UNDARE, votó como miembro y completó las hojas de acceso atinentes al control de las personas que entraban a su casa.

Ahora bien, en el 2002 la nueva administración de UNDARE alegó desconocer la razón por la cual el señor Carlos Alonso pagaba $50.00 mensuales y no los $125.00 mensuales que pagaban el resto de sus miembros. Por tal razón, UNDARE refirió a su abogado la cuenta del señor Carlos Alonso para cobro judicial.

En vista de ello, la señora Alonso Piñero presentó una demanda en el Tribunal de Primera Instancia contra UNDARE. En ella solicitó la restitución de las sumas pagadas en concepto de cuotas de mantenimiento, pues no había autorizado por escrito el cierre de la urbanización según requerido por la Ley de Control de Acceso, *infra*. Luego de varios trámites procesales, el 18 de diciembre de 2013 el Tribunal de Primera Instancia dictó sentencia sumaria. Resolvió que la señora Alonso Piñero no tenía obligación de realizar los pagos referentes al control de acceso, ya que no autorizó el cierre de la urbanización ni se había comprometido a ello por escrito. Empero, determinó que UNDARE no estaba obligado a devolver los pagos realizados

---

[5] Desde julio de 2001 hasta octubre de 2009, la señora Alonso Piñero pagó una suma de $ 13,991.00 a UNDARE. Véase *Sentencia,* íd*.,* pág. 13.

por la peticionaria porque habían sido efectuados por un error de derecho.[6]

En desacuerdo con el dictamen del Tribunal de Primera Instancia, UNDARE presentó un recurso de apelación ante el Tribunal de Apelaciones. En éste únicamente cuestionó la determinación del foro primario respecto a que la señora Alonso Piñero no estaba obligada a pagar las cuotas de mantenimiento. Señaló, en síntesis, que se debió reconocer los efectos legales del *Certificado de Aceptación/Adopción* otorgado por el padre de la señora Alonso Piñero y que ésta no presentó objeción a que se implementara el control de acceso.

El Tribunal de Apelaciones revocó parcialmente la sentencia recurrida. Resolvió que la señora Alonso Piñero tenía la obligación de continuar con los pagos relacionados a las cuotas de mantenimiento del sistema de control de acceso. Razonó que, si bien no consintió por escrito, su anuencia con el régimen de control de acceso era evidente por sus actos conscientes al asumir y continuar con los pagos de las cuotas de mantenimiento por casi diez años. Concluyó, en ese sentido, que su conducta fue contradictoria conforme a las doctrinas de actos propios e incuria.

---

[6] Cabe mencionar que en <u>ELA v. Crespo Torres</u>, 180 DPR 776 (2011), revocamos la distinción que se había elaborado sobre el error de derecho y error de hecho para efectos de restituir lo cobrado indebidamente. Ahora bien, esta norma se estableció prospectivamente por lo que no es de aplicación a casos como el de autos. Véase <u>Pagán Santiago v. ASR</u>, 185 DPR 341, 369 (2012), en el cual aclaramos que "debemos aplicar la norma vigente al momento de los hechos que dieron génesis a la controversia del caso […], pues aunque fue revocada, dicha revocación es de aplicación prospectiva a casos que surjan luego de la opinión emitida en *E.L.A. v. Crespo Torres*, supra".

Inconforme, la señora Alonso Piñero acudió ante esta Curia e imputó al Tribunal de Apelaciones la comisión de los errores siguientes:

> PRIMER ERROR: Erró el Tribunal Apelativo al revocar la sentencia del TPI basándose en que el carácter continuo de los pagos hechos por la apelante y su conformidad con las circunstancias del cierre, constituyeron una autorización y anuencia concreta, que, si bien no fue articulada en manuscrito, sí fue enunciada mediante su acción manifiesta, la cual comunicó su acuerdo con el régimen de control de acceso expresamente.

> SEGUNDO ERROR: Erró el TA al revocar la sentencia del TPI fundamentándose en que la Apelada nunca objetó las facturas, ni protestó, ni realizó ningún acto afirmativo que indicara su inconformidad; e hizo pagos por al menos 10 años antes de reclamar que no tenía obligación de hacerlos.

> TERCER ERROR: Erró el TA al revocar la sentencia del TPI basándose en que "surge de la sentencia impugnada que la Sra. Alonso Piñero, además de ser dueña y habitar la casa mientras se produjo el cierre, tuvo conocimiento de la anuencia al mismo y pagos hechos por su padre para tal época y contexto.".

Por su parte, UNDARE presentó un *Memorando en Oposición a la Apelación*. En resumen, adujo lo siguiente: (1) que la apelante asistió a una asamblea ordinaria de UNDARE el 27 de octubre de 2009 en la cual votó como miembro y no en calidad de residente opositora al cierre; (2) que no se le había notificado la donación de la residencia; (3) que descansó de buena fe en el certificado de adopción suscrito por el señor Carlos Alonso, en el cual éste manifestó ser el dueño del inmueble en cuestión; y (4) que, en consecuencia, a la señora Alonso Piñero le son aplicables las doctrinas de incuria y actos propios.

Así las cosas, el 28 de octubre de 2016 acogimos el recurso y lo expedimos como un *certiorari*. Con la comparecencia de las partes, a la luz de este cuadro fáctico, procedemos a exponer el derecho aplicable a la controversia que nos ocupa.

**II**

La Asamblea Legislativa aprobó la Ley de control de tráfico de vehículos de motor y uso de calles (Ley de Control de Acceso), Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 LPRA sec. 64 *et seq.*, con el objetivo de proveerle a la ciudadanía un instrumento adicional para combatir la criminalidad y procurar su cooperación activa en la lucha contra el crimen.[7] En ese sentido, creó un mecanismo voluntario en el cual las urbanizaciones y las comunidades ——luego de obtener la autorización correspondiente—— pudieran controlar el acceso vehicular y el uso público de sus calles residenciales.

Asimismo, la ley tuvo el propósito de instituir las condiciones generales necesarias para poder someter la urbanización, calle o comunidad a un régimen de control de acceso. Estableció como requisito, entre otras cosas, que la solicitud de autorización para controlar el acceso a la urbanización, calle o comunidad debía ser adoptada por tres cuartas partes (3/4) de los propietarios de las viviendas.[8] Aclaró que dicha autorización debía **hacerse constar**

---

[7] Exposición de Motivos de la Ley Núm. 21 de 20 de mayo de 1987 (1987 Leyes de Puerto Rico 67); Caquías v. Asoc. Res. Mansiones Río Piedras, 134 DPR 181, 186 (1994).

[8] 23 LPRA sec. 64a.

**expresamente por escrito bajo la firma de cada propietario.**[9] Dispuso, además, que la comunidad debía comprometerse y presentar garantías de que asumirían los gastos de instalación, operación y mantenimiento de las facilidades para el control del acceso a la urbanización o comunidad.[10]

Así pues, la Ley de Control de Acceso, *supra*, permitió que los miembros de una comunidad, calle o urbanización se organicen en un consejo, junta o asociación mediante la cual pueden solicitar un permiso para establecer el mecanismo de acceso controlado. De igual modo, con el fin de asegurar el funcionamiento continuo del referido sistema, concedió a dicho ente la facultad de imponer y cobrar una cuota para cubrir los costos y gastos de instalación, operación y mantenimiento del sistema de control de acceso.

No obstante, la obligación de pagar las cuotas mencionadas no se impuso a todo miembro de la comunidad, calle o urbanización que implantara tal régimen. Esa obligación no se atribuyó a aquellas personas que se opusieron a la implantación del sistema, es decir, a quienes no lo habían autorizado expresamente. Si bien la ley permitió el acceso controlado a ciertas urbanizaciones, calles o comunidades ——conforme los requisitos y criterios reseñados en ella——, la realidad es que "enfatiz[ó] la importancia y el respeto que merece la opinión de aquellos propietarios que se op[usieron] a la implantación del

---

[9] Íd.

[10] Íd.

control de acceso".[11] A esos efectos, aunque los eximió de contribuir con las cuotas, reconoció el derecho de todos los propietarios a asistir a las asambleas generales de la asociación de residentes, participar con voz y voto en las mismas y gozar de los mismos beneficios que los demás residentes.[12]

Es importante destacar que originalmente la ley no contenía disposición que reconociera los derechos de los opositores del sistema de control de acceso. Fue mediante la Ley Núm. 156 de 10 de agosto de 1988 (1988 Leyes de Puerto Rico 723-732), que la Asamblea Legislativa enmendó sustancialmente la ley e incluyó la facultad de la asociación de imponer una cuota de mantenimiento y algunas disposiciones que expresamente reconocieron varios derechos a los opositores del sistema. De esa forma, conscientes de que para hacer efectiva esa participación comunitaria era necesario que se propiciara un método de financiamiento que hiciera factible establecer el control de acceso y mantenerlo en funcionamiento, instituyó varias alternativas que así lo garantizaran.[13] Allí, y en las posteriores enmiendas incorporadas por la Ley Núm. 22 de 16 de julio de 1992 (1992 Leyes de Puerto Rico 141), fue que se instauró un sistema de cuotas mediante las cuales los propietarios

---

[11] Asoc. Residentes Urb. Sagrado Corazón, Inc. v. Arsuaga Álvarez, 160 DPR 289, 301-302 (2003).

[12] 23 LPRA sec. 64g.

[13] Exposición de Motivos de la Ley Núm. 156, *supra*, pág. 724; Exposición de Motivos de la Ley Núm. 22 de 16 de junio de 1992 (1992 Leyes de Puerto Rico 141).

financiaran el régimen de acceso controlado.[14] Claro está, como mencionáramos, se exceptuaron de esta obligación a aquellos propietarios que no autorizaron su establecimiento.

De ese modo, luego de ser enmendada por ambas leyes, la Sección 15 de la Ley de Control de Acceso dispuso que "[l]os propietarios que **no autorizaron expresamente** el establecimiento del sistema de control de acceso no est[án] obligados al pago de cuotas para el establecimiento, operación, mantenimiento o remoción de dicho sistema **excepto en aquellos casos que se comprometan a dichos pagos mediante contrato escrito**".[15] En el caso de que estuviera presente esta última circunstancia, estableció que éstos estarían "sujetos a las obligaciones y disposiciones de la sec. 64d-3 de este título".[16]

La Sección 10 (sec. 64d-3 en LPRA) de la Ley de Control de Acceso enumeró las personas en las cuales recae el pago de las cuotas para cubrir los costos y gastos de instalación, operación y mantenimiento del sistema de control de acceso.[17] Al así hacerlo, específicamente estableció que esta obligación correspondía a las personas siguientes:

> (1) Los propietarios de fincas en las que se haya inscrito la autorización o permiso bajo el procedimiento establecido en la sec. 64d-1 de este título.

---

[14] Íd.

[15] (Énfasis suplido). 23 LPRA sec. 64g. Véase además <u>Caquías v. Asoc. Res. Mansiones Río Piedras</u>, *supra*, pág. 192.

[16] 23 LPRA sec. 64g.

[17] Véase íd., sec. 64d-3.

(2) Los propietarios que autorizaron la solicitud para establecer el control de acceso, según fue implantado.

(3) Todo propietario adquirente de una finca, ubicada en una urbanización, calle o comunidad que ha sido autorizada por el municipio correspondiente para controlar el acceso o que, a la fecha de la compraventa, se encontrara en trámite de obtener el consentimiento de tres cuartas (3/4) partes de los propietarios y así conste en actas. Incluso, dicha obligación recaerá sobre toda aquella persona que no sea propietario adquiriente pero que advenga titular de la propiedad o comunero mediante una participación alícuota en común proindiviso, sin limitarse a los herederos o legatarios. Estas personas tendrán las mismas responsabilidades del pago de las cuotas de mantenimiento de propiedad desde el momento que advengan titular o comunero, como si fueran propietario adquiriente.

(4) Cuando la solicitud fue hecha por el urbanizador, desarrollador o constructor, el pago de cuota será obligatorio para toda persona que advenga dueño del inmueble.

(5) **Los propietarios que no autorizaron expresamente el establecimiento del sistema de control de acceso, pero que en fecha posterior se comprometieron al pago mediante <u>contrato escrito</u>**.[18] (Énfasis suplido).

Asimismo, en virtud de la Ley de Control de Acceso, *supra*, la Junta de Planificación promulgó el <u>Reglamento de control de tránsito y uso público de calles locales</u> (Reglamento de Planificación Núm. 20), Reglamento Núm. 3843 de 7 de febrero de 1989. Este reglamento reiteró en sus disposiciones lo mencionado sobre los propietarios que no autorizaron el sistema de control de acceso y el método de financiamiento que propiciara mantenerlo en funcionamiento. Al igual que la ley el reglamento reconoció que aquellos propietarios que no favorecieron el control de acceso no

---

[18] Íd.

están obligados a pertenecer al Consejo de Residentes ni al pago de cuotas para el establecimiento, operación, mantenimiento o remoción del sistema, salvo se comprometieran posteriormente "a dichos pagos mediante **contrato escrito**".[19]

Discutido lo anterior, pasemos a resolver las controversias ante nuestra consideración. Según hemos reconocido en el pasado, "nos corresponde imprimirle una interpretación adecuada y razonable" a las disposiciones de la ley y el reglamento precitado.[20]

### III

En la sentencia recurrida el Tribunal de Apelaciones sostuvo que la peticionaria fue consciente del pago de las cuotas de mantenimiento de control de acceso relativas a su propiedad por casi diez años. Expuso que la señora Alonso Piñero era la dueña del inmueble mientras se produjo el cierre, tuvo conocimiento de la anuencia y los pagos realizados por su padre y había continuado con los pagos una vez éste falleció sin objeción alguna. De la misma forma, razonó que ésta se benefició del sistema por muchos años y completaba las hojas de control de acceso sobre las personas que entraban a su casa, por lo que UNDARE confió en la conducta desplegada por la peticionaria. Por ello, resolvió que la señora Alonso Piñero había cometido incuria y prestó su anuencia al establecimiento del sistema de control de

---

[19] (Énfasis suplido). Reglamento de Planificación Núm. 20, *supra*, Secs. 10.01-10.02.

[20] Asociación de Residentes Urb. Sagrado Corazón, Inc. v. Arsuaga Álvarez, 160 DPR 289, 306 (2003).

acceso, lo que le impedía ejercer una posición contraria a la ya manifestada a través de sus actos.

Igualmente, UNDARE sostuvo que a la señora Alonso Piñero le aplican las doctrinas de incuria y actos propios. Arguyó que la conducta de la peticionaria equivale a su aceptación de contribuir con el pago de las cuotas de mantenimiento. Como fundamento, argumentó que el hecho de que la señora Alonso Piñero asistió a las asambleas de la asociación y había votado y firmado en el espacio correspondiente a los miembros equivalía a consentir al régimen de control de acceso y al pago de las cuotas mencionadas. Además, adujo que la obligación de la peticionaria surgió porque su padre continuó en posesión de la casa y, a su vez, ejercitó actos que le hicieron creer que era dueño de la propiedad sin que la señora Alonso Piñero formulara oposición.

Por su parte, la señora Alonso Piñero sostuvo que, en vista de que nunca consintió a la implementación del sistema de control de acceso ni al pago de las cuotas de mantenimiento por escrito, no estaba obligada a contribuir con éste monetariamente. Arguyó que los pagos que realizó a UNDARE no constituyen el consentimiento que requirió la Asamblea Legislativa mediante la Ley de Control de Acceso, *supra*. Argumentó, de igual manera, que el hecho de que su padre pagó a UNDARE alguna cantidad por cuotas de mantenimiento no la obliga a continuar con los pagos. Adujo que el error de continuar los pagos que realizaba su padre únicamente la perjudicó a ella y que los realizó al creer

que se trataba de una deuda de su padre con UNDARE. Así, reiteró que la obligación de pagar las cuotas de mantenimiento únicamente podía ser asumida mediante su aceptación expresa y por escrito. La peticionaria tiene razón.

Dado que los tres errores señalados se circunscriben a cuestionar la determinación del Tribunal de Apelaciones, a los efectos de que los actos de la señora Alonso Piñero constituían su consentimiento al sistema de control de acceso y, por ende, asumió la obligación de pagar las cuotas de mantenimiento; en primer lugar, a la luz de la normativa antes expuesta, analizaremos la forma en que debe prestarse el consentimiento para comprometerse al pago de las cuotas de mantenimiento de un sistema de control de acceso. Como parte de ello, analizaremos si el *Certificado de Aceptación/Adopción* suscrito por el padre de la peticionaria era válido y suficiente para obligar a la señora Alonso Piñero al pago de las cuotas de mantenimiento. En segundo lugar, resolveremos si procedía aplicar al presente caso las doctrinas de equidad, como la incuria y actos propios.

**A.**

Como regla general no existe alguna exigencia en cuanto a la forma en que se debe celebrar un contrato.[21] En esos casos la manera en que se haga constar el acuerdo o se asuma la obligación no tiene mayor trascendencia porque el contrato será válido cualesquiera que sea la forma en que se

---

[21] Véase Art. 1230 del Código Civil de Puerto Rico, 31 LPRA sec. 3451.

haya realizado. Claro está, tendrá validez siempre y cuando el negocio jurídico cumpla con los demás requisitos esenciales.[22]

Ahora bien, en lo que respecta a los requisitos de forma *ad solemnitatem,* la forma es necesaria para la existencia y validez del negocio jurídico.[23] Es decir, hay instancias en que se ha encontrado oportuno establecer algún requisito de forma sin el cual el contrato sería inexistente. Tal ha sido el caso de aquellas ocasiones en que la Rama Legislativa establece como requisito esencial del contrato que se haga constar por escrito.[24]

En ese sentido, es preciso mencionar que el Proyecto del Senado 1200 de 15 de noviembre de 1991, eventual Ley Núm. 22, *supra*, inicialmente imponía la obligación de formular oposición, de manera expresa y por escrito, a aquellas personas que no estuvieran de acuerdo con la implementación del sistema de acceso controlado. Consagraba, particularmente, que "[a]quellas personas que se op[usieran] a la implantación del sistema, deb[ían] hacerlo expresamente

---

[22] Íd. El Art. 1213 del Código Civil de Puerto Rico establece que "[n]o hay contrato sino cuando concurren los requisitos siguientes:

(1)      Consentimiento de los contratantes.

(2)      Objeto cierto que sea materia del contrato.

(3)      Causa de la obligación que se establezca".

Íd., sec. 3391.

[23] Banco Popular v. Registrador, 172 DPR 448, 459 (2007), citando a L. Díez-Picazo y otros, Sistema de Derecho Civil, 9na ed., Madrid, Ed. Tecnos, 1997, Vol. I, pág. 512; López Torres v. González Vázquez, 151 DPR 225, 232 (2000).

[24] Véanse, por ejemplo: Art. 8.016 de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, Ley Núm. 81-1991, según enmendada, 21 LPRA sec. 4366; Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975, según enmendada, 2 LPRA sec. 97; Colón Colón v. Mun. de Arecibo, 170 DPR 718, 726 (2007).

y por escrito, en el momento en que se llev[ara] a cabo gestión para obtener de los residentes las autorizaciones necesarias para solicitar el permiso de control de acceso".[25] Por esa razón, como parte de la discusión que generó el Proyecto del Senado 1200, *supra*, se entendió que ——según consignado en el proyecto hasta ese momento—— "si el residente se opon[ía] a la implantación del sistema deb[ía] hacerlo constar por escrito, pues de otro modo se entendería que la aprobó de **forma tácita**".[26]

La premisa articulada que permeaba en las enmiendas que inicialmente incorporaría el Proyecto del Senado 1200 era que, para no estar obligado al pago de cuotas, el titular del inmueble tenía que haberse opuesto expresamente.[27] En otras palabras, bajo ese lenguaje se consideraba que la inacción del propietario equivalía a su consentimiento al establecimiento del sistema de control de acceso y, consecuentemente, al pago de las cuotas de mantenimiento.

Como pudimos ver, ese lenguaje fue alterado posteriormente. Como parte del debate legislativo, el entonces senador José G. Izquierdo Stella sugirió enmendar el proyecto de ley.[28] Así, la Asamblea Legislativa estableció

---

[25] P. del S. 1200 de 15 de noviembre de 1991, pág. 2. Véase además, Informe de la Comisión Especial sobre Criminalidad de 26 de febrero de 1992 sobre el P. del S. 1200, *supra,* pág. 12, en el cual se expresó que "[l]a enmienda provee para que todo propietario que no esté de acuerdo y se oponga a solicitar el permiso, lo haga por escrito y de esa manera queda liberado de contribuir económicamente".

[26] (Énfasis suplido). Memorial de la Junta de Planificación de 27 de enero de 1992 sobre el P. del S. 1200, *supra*, pág. 1.

[27] Íd., pág. 2.

[28] Véase Diario de Sesiones de la Asamblea Legislativa, San Juan, Vol. XLIV, Núm. 19, pág. 361 (5 de marzo de 1992).

que los propietarios **que favorecieran** la implementación del sistema fueran las personas que hicieran constar su consentimiento expresamente y por escrito.[29] De hecho, a preguntas del señor Martín García sobre si las enmiendas propuestas significaban que se requería que el titular hubiera dado su consentimiento expresamente para quedar obligado al pago de cuotas de mantenimiento, el señor Izquierdo Stella contestó lo siguiente: "Así es. **Tiene que darlo <u>por escrito</u>**. Esa es la enmienda de los compañeros y la enmienda que usted había sugerido también".[30] Las enmiendas sugeridas por el señor Izquierdo Stella fueron aprobadas y se hicieron formar parte de la actual Ley de Control de Acceso.

Conforme a lo anterior, tanto la Sección 10 como la Sección 15 de la Ley de Control de Acceso, eliminaron el consentimiento tácito de quienes no expresaran su oposición por escrito y el cual, según se había argumentado, incorporaría el Proyecto del Senado 1200, *supra*. Nótese que finalmente la Asamblea Legislativa estableció que los propietarios que no consintieron expresamente el establecimiento del sistema de control de acceso estarían eximidos del pago de las cuotas de operación, mantenimiento o remoción de dicho sistema. A esos efectos, dispuso claramente que estos propietarios podían asumir el compromiso de esos pagos por contrato escrito.

---

[29] 23 LPRA sec. 64a.

[30] Diario de Sesiones, *supra*, pág. 362.

Un examen de la Ley de Control de Acceso, *supra*, y el Reglamento de Planificación Núm. 20, *supra*, impide que lleguemos a otra conclusión pues, particularmente, estamos imposibilitados de ignorar el lenguaje claro que contienen. Al respecto, hemos expresado que "cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa".[31] Además, como es sabido, cuando la ley es clara y libre de toda ambigüedad no debemos menospreciar su texto so pretexto de cumplir con su espíritu.[32] En este caso, tanto el texto de la ley como la intención pronunciada de la Asamblea Legislativa nos lleva a la misma conclusión.

En Caquías v. Asoc. Res. Mansiones de Río Piedras, 134 DPR 181 (1994), este Tribunal tuvo la oportunidad de aclarar algunos aspectos sobre los derechos y obligaciones de ciertos propietarios que no habían autorizado un sistema de control de acceso en su urbanización. A tono con las disposiciones de la Ley de Control de Acceso y el Reglamento de Planificación Núm. 20, determinamos que no podía obligarse al pago de cuotas de mantenimiento del sistema de control de acceso a unos residentes que no suscribieron el contrato a esos efectos. Específicamente, concluimos que los opositores del sistema no estaban obligados a pagar las cuotas de mantenimiento porque ninguno de ellos había firmado el contrato de mantenimiento mediante el cual los demás titulares se comprometieron a sufragar los gastos de

---

[31] Romero Barceló v. E.L.A., 169 DPR 460, 476-77 (2006).

[32] Art. 14 del Código Civil de Puerto Rico, 31 LPRA sec. 14.

operación del régimen.[33] Más aún, reconocimos que suscribir una autorización para que la asociación de residentes realizara gestiones para limitar la entrada y salida de personas extrañas a su comunidad no constituía el contrato escrito exigido por la ley.[34] Así, aunque en Caquías, *supra*, no estaba ante nuestra consideración determinar la posibilidad de que los titulares pudieran comprometerse al pago de las cuotas de mantenimiento a través de otro medio que no fuera un contrato escrito, *sub silentio*, reconocimos que así se debía hacer constar al asumirse tal obligación.

Al igual que en aquella ocasión, no podemos dar al traste con el lenguaje expreso y claro de la Ley de Control de Acceso, *supra*. Como mencionáramos, ésta requiere que los propietarios que inicialmente se opusieron al sistema, para obligarse posteriormente al pago de cuotas de mantenimiento, asuman esa obligación mediante contrato escrito. Dicha exigencia fue establecida por la Asamblea Legislativa y tiene entero sentido en virtud del efecto y la obligación que de ahí en adelante asume el propietario del inmueble.

**B.**

Por otro lado, UNDARE afirma que la señora Alonso Piñero "no puede ahora cuestionar la validez, ni las obligaciones jurídicas dimanantes de la firma de Certificado de Aceptación/Adopción". Ello, según alegó, porque para impugnar el consentimiento prestado en el documento debemos

---

[33] Caquías v. Asoc. Res. Mansiones Río Piedras, *supra*, pág. 213. Expresamos "que los residentes opositores no están obligados por contrato o inscripción registral a pagar las cuotas para el mantenimiento del sistema". Íd., pág. 220.

[34] Íd., pág. 213.

recordar que tenía cuatro años, plazo que ya había transcurrido. Arguye que luego de transcurrir ese término el consentimiento que prestó el padre de la peticionaria se convalidó y obliga a ésta. Por consiguiente, aduce que la declaración jurada prestada por el señor Carlos Alonso, como su heredera, la obliga en virtud del Art. 1209 del Código Civil de Puerto Rico. Tampoco le asiste la razón.

UNDARE pierde de perspectiva que el plazo de cuatro años únicamente es aplicable a los contratos celebrados en virtud de un consentimiento viciado —anulable— y no cuando se trata de un consentimiento nulo o inexistente. Así, por ejemplo, en Asociación de Residentes Urb. Sagrado Corazón, Inc. v. Arsuaga Álvarez, 160 DPR 289 (2003), la asociación de residentes de la urbanización presentó una demanda en cobro de dinero contra el Sr. Juan Arsuaga Álvarez (demandado). En ella reclamó el pago de cierta cantidad de dineros por concepto de cuotas de mantenimiento del sistema de control de acceso. Por su parte, el demandado adujo que nunca autorizó el cierre de la urbanización ni se comprometió a participar económicamente en su implantación. Por ello negó adeudar cantidad alguna por ese concepto.

En el caso las partes habían estipulado que cuando el demandado y su esposa adquirieron el inmueble no se había implementado un sistema de acceso controlado. Éstos se divorciaron y, quedando pendiente la liquidación de los bienes de la comunidad post-ganancial, su entonces ex esposa prestó su autorización al establecimiento de un sistema de control de acceso en la urbanización. Al igual que en el

caso del padre de la peticionaria, lo hizo mientras ella residía en el inmueble y consignando su firma en una declaración jurada titulada *Certificado de Aceptación/Adopción,* en la cual indicó no tener objeción al establecimiento del sistema de acceso controlado. En efecto, las partes reconocieron que el demandado nunca firmó ningún documento autorizando el cierre de la urbanización u obligándose al pago de las cuotas para el mantenimiento del sistema. Así las cosas, se liquidó la comunidad habida entre ambos y, para no perder la propiedad, el demandado acordó comprarle a su ex esposa el cincuenta porciento de su participación en el inmueble.

Una vez el caso llegó ante nuestra consideración, *inter alia,* tuvimos que determinar si el consentimiento prestado por la ex esposa del demandado ——luego de divorciados—— era suficiente y válido como para obligarlo al pago de las cuotas de mantenimiento.[35] Resolvimos en la negativa.

Reiteramos que al demandado "la ley le reconoce el derecho de oponerse al cierre y de **no contribuir con los costos de mantenimiento con su simple silencio**".[36] Aunque su ex esposa era cotitular del inmueble al momento de prestar su consentimiento por escrito, al existir una comunidad de bienes post-ganancial entre el demandado y su ex esposa, determinamos que la autorización al control de acceso constituía un acto de administración que requería del

---

[35] También tuvimos que resolver si la sección 10 de la Ley de Control de Acceso, *supra*, aplicaba al demandado y lo obligaba al pago de las cuotas reclamadas. Determinamos que no.

[36] (Énfasis suplido). <u>Asociación de Residentes Urb. Sagrado Corazón, Inc. v. Arsuaga Álvarez</u>, *supra*, pág. 322.

consentimiento de la mayoría de los comuneros; en este caso, de ambos. En otras palabras, aun cuando la ex esposa residía en el inmueble en ese momento y era su copropietaria cuando firmó la declaración jurada, resolvimos que la mayoría de los titulares debía consentir para que la autorización fuera válida y suficiente en derecho. En vista de ello, concluimos que el demandado no estaba obligado a contribuir con los gastos de mantenimiento.

En el caso ante nos, el único consentimiento que se hizo constar por escrito fue el brindado por el señor Carlos Alonso, quien no era ni siquiera titular de la propiedad sino un mero residente. Ahora bien, es harto conocido que el consentimiento brindado por un tercero no es suficiente si no se realiza por la persona con autoridad o una persona con autorización y en representación de quien correspondía prestar el consentimiento.[37] Es decir, debe ser producto de un mandato o poder conferido por el titular del derecho.

No surge en este caso que el consentimiento brindado por el señor Carlos Alonso, padre de la peticionaria, fuera en representación de su hija o por mandato de ésta. Por el contrario, según consta en el *Certificado de Aceptación/Adopción*, la autorización fue prestada bajo la premisa de que él era el dueño del inmueble; ello a pesar de que se lo había donado varios años antes a la señora Alonso

---

[37] Véase Art. 1211 del Código Civil de Puerto Rico, 31 LPRA sec. 3376; Scotiabank de Puerto Rico v. TCG (The Conerstone Group) Inc., 2017 TSPR 88. Véase además Soto v. Rivera, 144 DPR 500, 517 (1997). En este último caso uno de los cónyuges no consintió por escrito a la enajenación de un inmueble. Como el Código Civil así lo requería, reconocimos que sin el consentimiento escrito de ambos cónyuges el negocio jurídico no era válido pues se trataba de un acuerdo que no había surtido efectos jurídicos, por ende, *ultra vires*. Íd.

Piñero. Esto imposibilita que podamos hablar del término de cuatro años para anular un contrato por vicios en el consentimiento, como sostiene UNDARE.[38] Aquí el padre de la peticionaria carecía de facultad para aceptar la implantación del sistema de control de acceso por no ser el propietario del inmueble. En ese sentido, su consentimiento no es válido ni suficiente para obligar a la titular del inmueble a contribuir con los gastos de mantenimiento.

Por esa razón, aunque el Art. 1209, *supra*, establece que "[l]os contratos sólo producen efecto entre las partes que los otorgan y sus herederos", ese precepto exceptúa aquellos derechos y obligaciones que no son transmisibles ya sea por su naturaleza, el propio pacto o por disposición de ley. No negamos que una persona puede contribuir voluntariamente y por mera liberalidad pagar cuotas para el mantenimiento de un sistema de control de acceso. Sin embargo, la declaración jurada del señor Carlos Alonso no establece una obligación transmisible a sus herederos, por ser en todo caso personalísima. No tiene razón UNDARE al sostener que la peticionaria, como heredera del señor Carlos Alonso, era responsable de pagar las cuotas de mantenimiento del control de acceso. No hay duda de que este último no era el titular del inmueble ni tenía autorización para actuar en representación de su hija para consentir el cierre de la urbanización.

---

[38] Véase Art. 1252 del Código Civil de Puerto Rico, 31 LPRA sec. 3511.

Examinado lo anterior, estamos impedidos de aplicar las doctrinas de incuria y actos propios a este caso. Nos explicamos.

**IV**

**A.**

En primer lugar, es "[c]uando no haya ley aplicable al caso, [que] el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos".[39] Por ello, ante una situación que ha sido regulada por la Asamblea Legislativa debemos guiarnos por la norma establecida en el estatuto. En tal situación no hay cabida para aplicar los principios generales del derecho, ni los usos y costumbres aceptados y establecidos para otras instancias.

La doctrina anglosajona de incuria (*laches*), se ha definido como la "dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad".[40] De hecho, según hemos reconocido en el pasado, "[e]sta doctrina proviene de la máxima que la equidad auxilia a quien se mantiene vigilante en el reclamo de sus derechos y no a quien se duerme sobre la corriente sin

---

[39] Íd., sec. 7.

[40] Consejo de Titulares v. Ramos Vázquez, 186 DPR 311, 340 (2012). Véase, además: Molini Gronau v. Corp. PR Dif. Púb., 179 DPR 674, 687 (2010), citando a Comisión Ciudadanos v. G.P. Real Property, 173 DPR 998, 1019-1020 (2008); IM Winner, Inc. v. Junta de Subastas del Gobierno Municipal, 151 DPR 30, 39 (2000); Aponte v. Srio. de Hacienda, 125 DPR 610, 618 (1990).

mostrar excusas razonables para ello".[41] Ello estriba en que ——como es de esperarse—— una "reclamación tardía va en detrimento de la parte contraria, sobre todo cuando se tuvo oportunidad de reclamar diligentemente sus derechos".[42] Así pues, "la inacción de la parte por un largo periodo de tiempo y la legítima confianza de la otra parte, impide que se provean los remedios solicitados mediante reclamos tardíos".[43]

No obstante, sabido es que esa doctrina no aplica automáticamente por el mero trascurso del tiempo.[44] Su aplicación dependerá de la situación específica que presente cada caso. Ello exige que en nuestro análisis consideremos los factores siguientes: *primero*, si existe alguna justificación para la demora; *segundo*, el perjuicio que esta acarrea; y *tercero*, el efecto sobre los intereses privados o públicos involucrados.[45] La evaluación de estos factores es primordial al considerar resolver conforme a equidad.

Debemos tener presente que "[p]ara oponerse al control de acceso bajo la ley actual, basta con que el residente no presente autorización a la asociación para gestionar el permiso con el municipio".[46] Por ello, la inacción de los titulares equivale a un acto de oposición a la

---

[41] Consejo de Titulares v. Ramos Vázquez, *supra*, pág. 341.

[42] Íd., pág. 341; IM Winner, Inc. v. Junta de Subastas del Gobierno Municipal, *supra*, pág. 39.

[43] Consejo de Titulares v. Ramos Vázquez, *supra*, pág. 341.

[44] Íd., pág. 341; Comisión Ciudadanos v. G.P. Real Property, *supra*, pág. 1020.

[45] Consejo de Titulares v. Ramos Vázquez, *supra*, pág. 341; Comisión Ciudadanos v. G.P. Real Property, *supra*, pág. 1020. Véase, además, Srio. DACO v. J. Condominos C. Marti, 121 DPR 807, 822 (1988).

[46] Caquías v. Asoc. Res. Mansiones Río Piedras, *supra*, pág. 212

implementación del sistema de acceso controlado y al pago de las cuotas para su instalación y mantenimiento. Así, en supuestos como éste la señora Alonso Piñero no tenía que hacer nada, ya que la Ley de Control de Acceso —aplicable al caso— únicamente requiere el ejercicio de un acto cuando el propietario se compromete al pago de las cuotas mencionadas.

Aplicar la doctrina de incuria, para concluir que la peticionaria se obligó al pago de las cuotas de mantenimiento del sistema de control de acceso en la urbanización, requeriría que ignoremos el lenguaje claro de la ley. Además, conllevaría que incorporemos a nuestro ordenamiento jurídico una especie de consentimiento tácito al pago de las cuotas de instalación y mantenimiento de un sistema de control de acceso. Evidentemente esa posibilidad fue eliminada por la Asamblea Legislativa. La doctrina solo hubiera sido aplicable para negar la restitución de las sumas pagadas por la peticionaria si, luego de ponderar los factores esbozados anteriormente, se llegaba a la conclusión de que ésta había incurrido en dejadez o negligencia en su reclamo. En consecuencia, no procedía aplicar la doctrina de incuria para concluir que la peticionaria se comprometió al pago de las cuotas de mantenimiento del sistema de control de acceso de la urbanización.

**B.**

Por su parte, el contenido de la norma de que a nadie es lícito ir contra los actos propios tiene fundamento y

raíz en el principio general de Derecho que ordena proceder de buena fe en la vida jurídica.[47] La eficacia de la doctrina y su fuerza vinculante tienen vida y efecto propios, que van en protección de la confianza depositada en la apariencia, que es por extensión protección de un interés social o la consecución de un ideal de justicia. Así pues, la conducta contradictoria no tiene lugar en el campo del Derecho y debe ser impedida.[48]

Al determinar la aplicabilidad de la doctrina, hemos expresado que

> [l]os presupuestos necesarios o elementos constitutivos para la aplicación de la norma jurídica de que nadie puede venir contra sus propios actos pueden resumirse así: (a) Una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada.[49]

Un análisis de la situación ante nuestra consideración nos lleva a concluir que el hecho de que la señora Alonso Piñero participara en las asambleas ordinarias de UNDARE no puede tomarse en consideración para concluir que negarse a contribuir con los gastos de mantenimiento del sistema es actuar en contra de sus propios actos. Por el contrario, se trata del ejercicio legítimo de un derecho que le reconoce la propia Ley de Control de Acceso, *supra*.

---

[47] Int. General Electric v. Concrete Builders, 104 DPR 871, 877 (1976).

[48] Íd.

[49] Íd., pág. 878.

Así lo reconocimos en <u>Caquías v. Asoc. Res. Mansiones Río Piedras</u>, *supra*. En unos de los casos que allí atendimos, la asociación de residentes le negó ciertos beneficios del sistema de acceso controlado a varios propietarios que no autorizaron su implementación. Particularmente, los residentes que se habían negado a suscribir el contrato de mantenimiento se vieron privados de los controles remotos y la llave del portón de entrada. Al examinar la controversia reconocimos que todos los residentes, sin importar si favorecieron o no el cierre de la urbanización, gozan de sus beneficios de igual manera.[50] Al así hacerlo expresamos que

> [t]anto la Ley Núm. 21, según enmendada, *supra*, como el Reglamento Núm. 20 consagran el derecho de los residentes a oponerse al control de acceso. Dichos residentes no están obligados a pagar las correspondientes cuotas para "el establecimiento, operación, mantenimiento o remoción (Sec. 15 de la Ley Núm. 21, según enmendada, *supra*, 23 L.P.R.A. sec. 64g) del sistema; tampoco están obligados a pertenecer a la asociación de residentes, **aunque sí tienen derecho de voz y voto en las reuniones que ésta celebre**; finalmente, tienen derecho de acceso al área controlada bajo las mismas condiciones que los residentes que hayan favorecido el control de acceso. […]
>
> *El efecto neto de las anteriores salvaguardas es que los vecinos que se opongan al sistema de control de acceso tendrán exactamente los mismos derechos que los vecinos que hayan apoyado el sistema y que contribuyan económicamente a su mantenimiento.* Esto puede parecer injusto para aquellos residentes que apoyan la gestión. También puede prestarse a abuso por parte de residentes que, de mala fe, se opongan a la implantación del sistema de control de acceso para no tener que contribuir económicamente a su mantenimiento pero que en realidad desean la seguridad y tranquilidad que éste ofrece. No obstante, **ese es el balance que nuestro legislador estimó adecuado para**

---

[50] <u>Caquías v. Asoc. Res. Mansiones Río Piedras</u>, *supra*, pág. 212.

**proteger los intereses en conflicto.**[51] (Énfasis suplido y énfasis en el original).

Por otro lado, a pesar de que la señora Alonso Piñero continuó con los pagos que realizaba su padre, UNDARE tenía que saber que la peticionaria no estaba obligada a realizarlos ya que no existía un contrato escrito en el que se comprometiera a ello. Más aún, debemos tomar en consideración que el texto de la ley es claro e inequívoco al disponer que el **propietario** de la residencia es quien puede comprometerse a contribuir con los gastos y cuotas de mantenimiento.[52]

En cuanto al argumento de UNDARE de que la escritura de donación no le fue notificada y que creyó que el padre de la peticionaria era el propietario del inmueble, tampoco le asiste la razón. Surge que la señora Alonso Piñero era la titular registral desde antes del cierre de la urbanización y del establecimiento de UNDARE como su administradora.[53] Así, conforme el principio de publicidad, debemos imputarle a UNDARE el conocimiento de las constancias del Registro de la Propiedad y, por ende, que no ignoraba el hecho de que el señor Carlos Alonso no era el dueño del inmueble al momento de suscribir el *Certificado de Aceptación/Donación* en 1995.[54]

Como bien señala la señora Alonso Piñero, sus actos no son ni pueden ser, en conjunto o por separado, equivalentes

---

[51] Íd., págs. 211-212.

[52] Véase 23 LPRA secs. 64d-3 y 64g.

[53] Véase Asiento de presentación registral, Apéndice de la apelación civil, pág. 321; *Certificación*, íd., págs. 318-319.

[54] García Larrinua v. Lichtig, 118 DPR 120, 137 (1986). Véanse además: Metropolitan Marble Corp. v. Pichardo, 145 DPR 607, 613 (1998); Sabater v. Corp. Des. Eco. del Pastillo Inc., 140 DPR 497, 504 (1997).

al compromiso por escrito que la Asamblea Legislativa requirió para que pudiera asumir la obligación de pagar las cuotas de instalación, operación y mantenimiento de un sistema de control de acceso.

## V

Por los fundamentos antes expuestos, se resuelve que el propietario de un inmueble que no autorizó la implementación de un sistema de acceso controlado en su comunidad, urbanización o calle, para que se le puedan reclamar las cuotas de mantenimiento del sistema, tiene que haber asumido esa obligación mediante contrato escrito posteriormente, según dispone la Ley de Control de Acceso, *supra*, y el Reglamento de Planificación Núm. 20, *supra*. Como consecuencia, se revoca la *Sentencia* recurrida emitida por el Tribunal de Apelaciones.

Se dictará sentencia de conformidad.


Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carmiña Alonso Piñero

    Peticionaria

                      AC-2016-0055

    v.

UNDARE, Inc.

    Recurrida

En San Juan, Puerto Rico, a 15 de septiembre de 2017.

    Por los fundamentos expuesto en la Opinión que antecede, la cual se hace formar de la presente Sentencia, se resuelve que el propietario de un inmueble que no autorizó la implementación de un sistema de acceso controlado en su comunidad, urbanización o calle, para que se le puedan reclamar las cuotas de mantenimiento del sistema, tiene que haber asumido esa obligación mediante contrato escrito posteriormente, según dispone la Ley de Control de Acceso, *supra*, y el Reglamento de Planificación Núm. 20, *supra*. Como consecuencia, se revoca la *Sentencia* recurrida emitida por el Tribunal de Apelaciones.

    Lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo Interina. La Juez Asociada señora Rodríguez Rodríguez no intervino.

                      Sonnya Isabel Ramos Zeno
              Secretaria del Tribunal Supremo Interina